# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 3, 2010 Session

## MICHAEL ANGELO COLEMAN v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. P-11326    W. Mark Ward, Judge**

---

**No. W2007-02767-SC-R11-PD - Filed April 11, 2011**

---

This appeal involves the role of expert testimony in proceedings to determine whether a prisoner who has been sentenced to death is intellectually disabled and thus barred from being executed under Tenn. Code Ann. § 39-13-203 (2010).  An inmate facing execution filed a motion in the Criminal Court for Shelby County to re-open his post-conviction proceedings on the ground that he was intellectually disabled at the time he committed the crime for which he was convicted and on the ground that his trial counsel had been ineffective in investigating and presenting mitigating evidence.  At the hearing, the prisoner presented expert testimony that his functional intelligence quotient ("I.Q.") was actually lower than the raw test scores on his I.Q. tests and that he was mentally disabled for the purpose of Tenn. Code Ann. § 39-13-203(a).  The State presented no contrary evidence.  The trial court dismissed the prisoner's motion to re-open his post-conviction petition after concluding that he had failed to prove that he was intellectually disabled and that he was procedurally barred from raising his ineffective assistance of counsel claim.  The Court of Criminal Appeals affirmed the judgment of the trial court.  *Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 WL 118696 (Tenn. Crim. App. Jan. 13, 2010).  We granted the prisoner's Tenn. R. App. P. 11 application for permission to appeal.  We find that Tenn. Code Ann. § 39-13-203(a)(1) does not require that raw scores on I.Q. tests be accepted at their face value and that the courts may consider competent expert testimony showing that a test score does not accurately reflect a person's functional I.Q. or that the raw I.Q. test score is artificially inflated or deflated.  We have also determined that both the post-conviction trial court and the Court of Criminal Appeals properly determined that the prisoner's claim involving the ineffective assistance of his trial counsel in connection with the investigation and presentation of mitigation evidence is procedurally barred.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal**
**Appeals Affirmed in Part and Vacated in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and SHARON G. LEE, JJ., joined.

Michael J. Passino and Kelley Henry, Nashville, Tennessee; William D. Massey, Memphis, Tennessee, for the appellant, Michael Angelo Coleman.

Robert E. Cooper, Jr., Attorney General and Reporter; Gordon W. Smith, Associate Solicitor General; James E. Gaylord, Assistant Attorney General; William Gibbons, District Attorney General; and John Campbell and Scott Bearup, Assistant District Attorneys General, for the appellee, State of Tennessee.

James W. Ellis, Albuquerque, New Mexico; Jodie Ann Bell, Nashville, Tennessee, for the Amicus Curiae, American Association of Intellectual and Developmental Disabilities and the Arc of the United States and the Arc of Tennessee.

Wade V. Davies, Knoxville, Tennessee, for the Amicus Curiae, Tennessee Association of Criminal Defense Lawyers.

**OPINION**

**I.**

Leon Watson left his home on the morning of May 2, 1979 to go to a nearby grocery store. While on this errand, he was accosted by Michael Angelo Coleman and Michael Anthony Bell who robbed and killed him. Mr. Coleman fired the fatal shot. Mr. Coleman also rifled through Mr. Watson's wallet and stole a pistol and citizens' band radio from Mr. Watson's car.

A short time later, officers arrested Messrs. Coleman and Bell on another charge. Early on the morning of May 3, 1979, after being advised of his *Miranda* rights, Mr. Coleman told the officers that he had found the body of an African-American man in a field near Third Street in Memphis. He directed the officers to the scene where they found Mr. Watson's body. Mr. Watson's empty wallet was nearby, and other items from Mr. Watson's automobile were strewn around the body.

After being again advised of his *Miranda* rights, Mr. Coleman confessed that he had shot and robbed Mr. Watson. Mr. Bell likewise identified Mr. Coleman as the person who shot Mr. Watson both in his statement to the authorities and at trial.

The trial of both Mr. Coleman and Mr. Bell began on April 15, 1980. On April 19, 1980, the jury found both men guilty of first degree murder in the perpetration of a robbery.

In addition to finding that the murder had been committed during the course of a robbery, the jury found, as an aggravating circumstance, that Mr. Coleman had previous felony convictions involving the use of violence.[1] The jury sentenced Mr. Coleman to death and Mr. Bell to life imprisonment.

In accordance with the appeals procedure then being used, Mr. Coleman appealed his conviction and sentence directly to this Court.[2] He sought relief from his conviction and sentence on the following grounds: (1) the denial of his motion to sever his trial from that of Mr. Bell, (2) the trial court's failure to remove a juror for cause, (3) the admission of Mr. Coleman and Mr. Bell's confessions, (4) the sufficiency of the evidence, and (5) the unconstitutionality of the Tennessee Death Penalty Act.[3] This Court found no merit in these arguments and affirmed Mr. Coleman's conviction and sentence. *See State v. Coleman*, 619 S.W.2d 112, 114-16 (Tenn. 1981).

Mr. Coleman filed his first petition for post-conviction relief on March 10, 1982. The post-conviction trial court conducted an evidentiary hearing on February 18, 1983. The court denied Mr. Coleman's petition on April 12, 1983. Mr. Coleman raised sixteen issues in his appeal to the Court of Criminal Appeals. One of these issues involved the effectiveness of his trial counsel. In that regard, Mr. Coleman cited ten instances where his trial counsel had been ineffective. Notably absent from Mr. Coleman's ineffective assistance of counsel claims were claims that his trial counsel had failed to investigate and present a mitigation case or that his trial counsel had failed to raise on direct appeal the trial court's denial of his motion for investigative resources.

---

[1] Mr. Coleman had been convicted of six prior violent felonies, including three convictions for assault with intent to commit first degree murder, one conviction for assault with intent to commit robbery with a deadly weapon, one conviction for robbery with a deadly weapon, and one conviction for kidnapping.

[2] Tenn. Code Ann. § 39-2406 (Supp. 1979) formerly provided for a direct appeal of death penalty convictions and sentences to this Court. This procedure was later amended to provide for a direct appeal from a capital conviction and sentence to the Court of Criminal Appeals with a right of automatic review by this Court if the Tennessee Court of Criminal Appeals affirms the conviction and sentence. Tenn. Code Ann. § 39-13-206(a)(1) (2010); *see generally Cauthern v. State*, 145 S.W.3d 571, 579 n.1 (Tenn. Crim. App. 2004).

[3] Mr. Coleman was originally represented by the Office of the Shelby County Public Defender. The Public Defender moved to be relieved from representing Mr. Coleman because the office was also representing Mr. Bell. The trial court granted the Public Defender's motion and appointed a sole practitioner to represent Mr. Bell. While the Public Defender had access to investigative resources, the private lawyer appointed to represent Mr. Coleman did not. Accordingly, he filed a timely motion seeking investigative assistance. The trial court denied the motion. While Mr. Coleman included the denial of his lawyer's request for investigative assistance in his motion for new trial, he did not raise this issue on his direct appeal to this Court.

On June 28, 1984, the Court of Criminal Appeals filed an opinion rejecting all of Mr. Coleman's arguments and affirming the dismissal of his petition for post-conviction relief. *See State v. Coleman*, Shelby County No. 31, 1984 Tenn. Crim. App. LEXIS 2883, at *4-36 (June 28, 1984), *perm. app. denied* (Tenn. Oct. 29, 1984). Both this Court and the United States Supreme Court declined to review the Court of Criminal Appeals' decision.

In May 1993, more than eight years after the Court of Criminal Appeals had affirmed the dismissal of his first post-conviction opinion, Mr. Coleman filed his second petition for post-conviction relief. The impetus of this petition was *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992).[4] In addition to his *State v. Middlebrooks* argument, Mr. Coleman raised three issues that he had not raised in his first petition for post-conviction relief – the trial court's denial of his pre-trial motion for investigative assistance, the exclusion of certain mitigation evidence during the sentencing phase of his trial, and the ineffective assistance of his trial counsel for failing to investigate and present mitigating evidence.

The State conceded that Mr. Coleman's sentence was contrary to *State v. Middlebrooks* but insisted that the error was harmless. The State also argued that Mr. Coleman's other claims were procedurally barred. The post-conviction trial court entered an order on March 7, 1996 dismissing Mr. Coleman's second post-conviction petition. The court concluded that the *Middlebrooks* error was harmless and that Mr. Coleman's other claims were procedurally barred. Mr. Coleman appealed to the Court of Criminal Appeals, raising the same errors he had raised in his second post-conviction petition. On December 4, 1998, the Court of Criminal Appeals affirmed the post-conviction trial court's decision that the *Middlebrooks* error was harmless and that Mr. Coleman's other issues were procedurally barred. *Coleman v. State*, 3 S.W.3d 19, 25 (Tenn. Crim. App. 1998). Both this Court and the United States Supreme Court declined to review the Court of Criminal Appeals' decision.

On December 3, 2002, Mr. Coleman filed his third petition seeking post-conviction relief, this time in the form of a motion to re-open his prior post-conviction petition. The

---

[4]This Court held in *State v. Middlebrooks* that the aggravating circumstance in Tenn. Code Ann. §§ 39-2-203(i)(7) (1982) and 39-13-204(i)(7) (1991) could not be applied constitutionally in cases where the death penalty is imposed for felony murder. *State v. Middlebrooks*, 840 S.W.2d at 346. In 1995, the Tennessee General Assembly responded to the *Middlebrooks* decision "by amending the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(7) to require that the murder 'was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit' one of the enumerated felonies." *State v. Banks*, 271 S.W.3d 90, 152 (Tenn. 2008) (quoting Act of May 22, 1995, ch. 377, 1995 Tenn. Pub. Acts 587). We later noted that "[t]his amendment narrowed the class of offenders to whom the death penalty could be applied sufficiently so as to leave no *State v. Middlebrooks* problem even in cases where Tenn. Code Ann. § 39-13-204(i)(7) was the only aggravating circumstance established and the conviction was for felony murder." *State v. Banks*, 271 S.W.3d at 152 (citing *State v. Reid*, 91 S.W.3d 247, 306 n.13 (2002) (appendix)).

impetus of this petition was *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) and *Van Tran v. State*, 66 S.W.3d 790, 812 (Tenn. 2001), in which the United States Supreme Court and this Court held that the death penalty could not be constitutionally applied to persons who were "mentally retarded."[5] Mr. Coleman asserted in his petition that he was mentally retarded as defined in Tenn. Code Ann. § 39-13-203(a) (1997). He also renewed his claim that his trial counsel had been ineffective because he failed to investigate and present mitigation evidence. On January 21, 2005, Mr. Coleman filed an amended motion to re-open his prior post-conviction opinion, arguing that *Howell v. State*, 151 S.W.3d 450 (Tenn. 2004) provided a new constitutional due process basis for hearing his ineffective assistance of counsel claim.

The post-conviction trial court conducted a hearing on January 18 and 19, 2007. Mr. Coleman presented testimony from Dr. Alfred Baumeister and Dr. George W. Woods, Jr. These expert witnesses provided detailed explanations of their conclusions that Mr. Coleman is intellectually disabled under the parameters in Tenn. Code Ann. § 39-13-203(a). The State presented no witnesses and only briefly cross-examined Mr. Coleman's experts.

On November 9, 2007, the post-conviction trial court filed an order denying Mr. Coleman's latest petition. The court concluded that Mr. Coleman had failed to prove by a preponderance of the evidence he met the requirements in Tenn. Code Ann. § 39-13-203(a) to be found intellectually disabled. The trial court also found that Mr. Coleman's ineffective assistance of counsel claim is procedurally barred.

Mr. Coleman appealed this decision to the Court of Criminal Appeals. He argued that the trial court erred by concluding that he did not establish by a preponderance of the evidence that he falls within Tenn. Code Ann. § 39-13-203(a)'s definition of intellectual disability. He also argued that the trial court erred by failing to consider his ineffective assistance of counsel claim on the merits. The Court of Criminal Appeals rejected both arguments. *See Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 WL 118696, at *23-31 (Tenn. Crim. App. Jan. 13, 2010).

---

[5]The terms "intellectual disability" and "mental retardation" refer to the same population in number, kind, type, and duration of disability. *See* President's Committee for People with Intellectual Disabilities, *A Charge We Have to Keep* 3 n.i (2004), http://www.acf. hhs.gov/programs/pcpid/docs/ mr_2004_final.pdf. Robert L. Schalock et al., *The Renaming of Mental Retardation: Understanding the Change to the Term Intellectual Disabilities*, 45 Intellectual and Developmental Disabilities 116, 116 (2007). Thus, the terms are interchangeable, Tenn. Code Ann. § 33-1-101(16)(C) (Supp. 2010), and "intellectual disability" is the preferred term. Am. Ass'n on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Support* 3 (11th ed. 2010) ("AAIDD Manual"). Accordingly, we will use the term "intellectual disability" in this opinion except in quoted material where we will use the term used in the material.

We granted Mr. Coleman's application for permission to appeal on June 17, 2010. Before this Court, Mr. Coleman contends that the post-conviction trial court and Court of Criminal Appeals erred in concluding he does not meet the statutory definition for intellectual disability under Tenn. Code Ann. § 39-13-203(a). He also argues that this Court announced a new due process rule in *Howell v. State* requiring consideration of his ineffective assistance of counsel claim on the merits rather than finding it to be procedurally barred. The State insists that Mr. Coleman has failed to establish that he meets Tenn. Code Ann. § 39-13-203(a)'s definition of intellectual disability and that his ineffective assistance of counsel claim is procedurally barred.

## II.

Mr. Coleman was born on November 11, 1957 to Alque Burrows and Shirley Coleman. Mr. Burrows was incarcerated throughout much of Mr. Coleman's childhood, and when Mr. Burrows was not in prison, he showed little inclination to be involved in his son's life. Ms. Coleman was intellectually disabled and had a history of mental illness. She was also an alcoholic and a drug abuser. Ms. Coleman drank throughout her pregnancy and attempted to abort her fetus by jumping from the roof of a shed. Ms. Coleman was anesthetized for the birth of her son, and Mr. Coleman was delivered with forceps.

The home in which Mr. Coleman was raised was chaotic, overcrowded, and unclean. His neighborhood was one of the most dangerous in Memphis. He was not adequately nourished and received little medical attention. His mother was abusive and often absent. Ms. Coleman, who drank nearly continuously during her waking hours, regularly resorted to prostitution as a source of income, often servicing her customers with her son nearby.

Mr. Coleman entered the first grade in 1963. He failed the first grade, the second grade, the third grade, and the seventh grade. When he did advance from one grade to the next, it was the result of a "social promotion." He was frequently absent from school and had continuing difficulties with his classmates. His dirty clothes, disheveled appearance, and his physical condition[6] prompted other students to tease and pick on him. Mr. Coleman was thus a lonely and stigmatized child who was intellectually and socially behind his peers.

Eventually Mr. Coleman became violent. He fought with other students; he became belligerent toward his teachers; and he even attempted to set fires at school. On one occasion, he attempted to set fire to himself while sitting at his desk. He was referred for psychological counseling when he was ten years old. The evaluator concluded that Mr. Coleman was then an alienated, lonely, and stigmatized child whose cognitive functioning

---

[6]Mr. Coleman had exophthalmos, a condition characterized by the protrusion of a person's eyeballs from their sockets.

was "dull" and who was experiencing "visual-perceptual problems." The evaluator made several social and academic recommendations but also indicated that Mr. Coleman should "receive materials from the Special Education Division" should these recommendations not produce results.

Mr. Coleman's fifth-grade teacher offered the following description of Mr. Coleman as a student in her class:

> He tried to keep up with the other students but he just wasn't able to do so. He was very slow and he couldn't read well. He often appeared "spaced out" as if he was distracted. He just wasn't able to stay focused on the school work. If I were teaching Michael today, I would have recommended he be placed in special education where he could get the individual attention he needed to learn the class material. But back then, special education wasn't very developed and we were encouraged to keep children in the regular classroom so as not to label them.

Because of his conduct, Mr. Coleman began to encounter law enforcement officers with increasing frequency. These officers also noticed Mr. Coleman's difficulties. One police officer who detained Mr. Coleman in the summer of 1971 for a curfew violation noted that Mr. Coleman "is below average in estimated mental capacity and his grade placement in relation to his age is 'retarded.' Michael is extremely slow and it is difficult to tell whether 36 hours in Detention will prove beneficial." On this occasion, Mr. Coleman was released instead of being placed in juvenile detention.

Mr. Coleman was again arrested in the summer of 1972 and was placed in a juvenile detention facility. While there, Dr. Frank Lee performed a psychological evaluation and concluded that Mr. Coleman was "borderline mentally retarded." Dr. Lee also concluded:

> Michael is lacking in both his academic knowledge and his awareness of his environment. He is well below average academically and his conceptual abilities are concrete . . . . [H]is knowledge of causal and sequential patterns in his environment is lacking. He seems to have difficulty comprehending and assessing situations and therefore may make inappropriate judgments. His ability to concentrate and his visual-motor coordination appear to be well below average. His prognosis for any academic success is poor.

The profile suggests Michael is an extremely agitated youngster who is likely to act out his feelings . . . . [H]e has a tendency to be a dependent youth who needs very much to feel he is loved and accepted. He is immature and likely to rely on denial and repression . . . . [A]t times he might experience some confusion due to his inability to accurately comprehend and assess his environment.

Because of Michael's extreme immaturity and low level of intellectual functioning, it is felt his needs can best be met by the Tennessee Development Center at Somerville . . . . His education should include repetitive learning of socially acceptable behavior.

Based on Dr. Lee's recommendation, Mr. Coleman was placed in the Tennessee Development Center at Somerville. He remained there until October 1973 when he was transferred to the Taft Youth Center in Pikeville. Mr. Coleman was placed in a seventh grade program at the Taft Youth Center even though he was sixteen years old and was functioning at a fifth-grade level.

Mr. Coleman struggled at Taft Youth Center. When Mr. Coleman was released from the Taft Youth Center in February 1974, he had not advanced academically, and he was still functioning at a fifth-grade level. Despite these shortcomings, Mr. Coleman was placed back into the public schools in the seventh grade. He received Ds and Fs in his classes.

Mr. Coleman did not appear to have any hobbies, interests, or personal involvements outside of school. He would walk alone in the park and, at times, abuse drugs. He was arrested repeatedly for, among other things, loitering, disorderly conduct, breaking a drugstore window, entering unlocked houses, stealing a car, smoking pot, drinking beer, and using other illegal drugs.

Eventually, Mr. Coleman was convicted of robbery and received a three-year sentence at the Fort Pillow Prison and Farm. There, he became a victim of sexual abuse. Fellow prisoners stated that he was an easy victim and that he was taken advantage of because he was physically small and intellectually slow. They recounted that Mr. Coleman was "turned out" – used by sexual predators – in an area of the prison known as the "car wash" where weaker prisoners were routinely subjected to gang rape. For the last four months of his incarceration, Mr. Coleman, at his own request, was sequestered in administrative segregation because of sexual threats against him.

Following his release from Fort Pillow, Mr. Coleman lived with the Braxton family from September 1977 until February 1978. Mr. Coleman had met Anthony Braxton in 1973 when they were both living at the Taft Youth Center. The two boys had a striking resemblance to each other, and they eventually discovered that they were actually half-brothers who had been born approximately three months apart. Mr. Coleman formed a close bond with his half-brother, who was intellectually disabled and functioning at the level of an eight year old.

Mr. Coleman appeared to have finally found a place where he belonged while he was living with the Braxton family. However, Anthony Braxton was murdered on February 23, 1978. This event caused Mr. Coleman to deteriorate, and he began to refer to himself regularly as "Anthony Braxton." Two weeks following the murder, Mr. Coleman was evaluated at a community mental health center because he was having hallucinations. He was diagnosed with paranoid schizophrenia and was prescribed potent anti-psychotic medications.

Following his release from Fort Pillow, Mr. Coleman also began abusing alcohol and drugs to an even greater extent than he had prior to his incarceration. One of his drugs of choice was phencyclidine (PCP), commonly known as "angel dust." There is little question that Mr. Coleman was on a dangerous spiral of mental instability, substance abuse, and violence following the murder of his half-brother in February 1978. This spiral culminated on May 2, 1979, when Mr. Coleman robbed and killed Mr. Watson.

### III.

The central issues in this case involve the process and criteria used by the courts to determine whether a criminal defendant charged with first degree murder should not be subject to the death penalty because he or she was a person with intellectual disability when the murder was committed. With specific reference to Tenn. Code Ann. § 39-13-203(a)(1), we must decide whether the evidence regarding the person's "functional intelligence quotient" at the time of the offense is limited to the raw score, the scores the person has received on I.Q. tests, or whether the evidence may also include competent expert testimony that the person's "functional intelligence quotient" at the time of the offense was "seventy (70) or below." We have determined that the plain language of Tenn. Code Ann. § 39-13-203(a)(1) does not limit to raw test scores the evidence regarding whether a criminal defendant is a person with intellectual disability.

### A.

The term "intellectual disability" does not refer to a single disorder or disease, but rather to a heterogeneous set of disabilities that affect the level of a person's functioning in

defined domains.[7]  An intellectual disability typically originates close to the time of birth, either during the fetal period, the birth process, or soon after birth.[8]  While there are many potential causes of intellectual disability, genetic disorders are thought to be the primary prenatal cause.[9]  Persons with intellectual disabilities frequently have other psychological and physical disorders.[10]

While there may be an "imperfect fit" between the clinical community's and the legal system's view of intellectual disability,[11] both the courts and the clinicians agree that persons with intellectual disabilities have a wide spectrum of disabilities and abilities[12] and that all these persons have a significantly reduced ability to cope with and function independently in the everyday world.  *See City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442 (1985); *Van Tran v. State*, 66 S.W.3d at 796; First & Tasman, at 17.  Thus, the definition of "intellectual disability" embraces a heterogeneous population ranging from persons who are totally dependent to persons who are nearly independent.  *Penry v. Lynaugh*, 492 U.S. 302, 338 (1989) (quoting American Association on Mental Deficiency, *Classification in Mental Retardation* 12 (Herbert J. Grossman ed., 8th ed. 1983)) ("AAMD Manual"); *see also City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. at 442-43.  The American Psychiatric Association currently recognizes four degrees of severity reflecting the level of a person's impairment.[13]

---

[7]Michael B. First & Allan Tasman, *Clinical Guide to the Diagnosis and Treatment of Mental Disorders* 17 (2d ed. 2010) ("First & Tasman"); *see also* American Association on Intellectual & Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* 13, 19 (11th ed. 2010) ("AAIDD Manual").  The American Association on Intellectual and Developmental Disabilities will be referred to as the "AAIDD."  The AAIDD was formerly known as the American Association on Mental Retardation and the American Association on Mental Deficiency.

[8]AAIDD Manual, at 27.

[9]James C. Harris, *Developmental Perspective on the Emergence of Moral Personhood in Cognitive Disability and its Challenge to Moral Philosophy* 57 (Eva Feder Kittay & Licia Carlson eds., 2010).

[10]First & Tasman, at 19; Martin Max & Christopher Gillberg, *Comorbidity in Developmental Disorders* 9 (2010); Robert Weis, *Introduction to Abnormal Child and Adolescent Psychology* 137 (2008).

[11]American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders xxxiii (4th ed. text rev. 2000) ("DSM-IV-TR").

[12]*See, e.g., Holladay v. Allen*, 555 F3d 1346, 1363 (11th Cir. 2009); *United States v. Hardy*, ___ F. Supp. 2d ___, 2010 WL 4909550, at *43 (E.D. La. Nov. 24, 2010); *In re Mark C.H.*, 906 N.Y.S. 2d 419, 428 (N.Y. Sup. Ct. 2010); First & Tasman, at 17.

[13]These four levels of impairment include: profound (I.Q. level of below 20 or 25), severe (I.Q. level of 20-25 to 35-40), moderate (I.Q. level of 35-40 to 50-55), and mild (I.Q. level of 50-55 to approximately
(continued...)

Estimates of the number of persons with intellectual disability as it is currently defined range from 1% to 3% of the population.[14] Of this group, it is estimated that approximately 85% would be classified, using the American Psychiatric Association's standards, in the "mild mental retardation" range.[15]

All persons who are intellectually disabled have substantial limitations in both intelligence and functioning compared to the general population. *Atkins v. Virginia* 536 U.S. at 318; *Van Tran v. State*, 66 S.W.3d at 795. As a result, when persons with intellectual disability are charged with capital crimes, fundamental concerns are raised regarding their mental state, lesser culpability, and reduced ability to meaningfully assist in their own defense. *Atkins v. Virginia*, 536 U.S. at 317-21; *see also Penry v. Lynaugh*, 492 U.S. at 322-23, 331-33; *Van Tran v. State*, 66 S.W.3d at 807.

These concerns prompted a constitutional challenge to executing persons with intellectual disability who were found guilty of capital crimes. In 1989, the United States Supreme Court determined that imposing the death penalty on persons who were intellectually disabled at the time of the offense did not violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Penry v. Lynaugh*, 492 U.S. at 340; *Penry v. Lynaugh*, 492 U.S. at 351 (Scalia, J., concurring in part and dissenting in part). In a portion of the opinion not joined by her colleagues, Justice O'Connor predicted that "a national consensus against execution of the mentally retarded may someday emerge reflecting the 'evolving standards of decency that mark the progress of a maturing society.'" *Penry v. Lynaugh*, 492 U.S. at 340.

## B.

Less than one year after the United States Supreme Court handed down its *Penry v. Lynaugh* decision, legislation was introduced in the Tennessee General Assembly to prevent

---

[13](...continued)
70). DSM-IV-TR, at 42, 49. The AAIDD does not use these categories and focuses more on necessary supports rather than I.Q. for subcategorization. AAIDD Manual, at 22-23; *see also Van Tran v. State*, 66 S.W.3d at 795 n.5 (noting that the AAMR [current AAIDD] no longer uses these terms and instead has developed profiles based on the level of support required).

[14]*Van Tran v. State*, 66 S.W.3d at 795; *see also* First & Tasman, at 19; Richard J. Morris & Yvonne P. Morris, *Developmental Disabilities, in Medical Aspects of Disability* 241 (Steven R. Flanagan et al., eds., 4th ed. 2011).

[15]*Van Tran v. State*, 66 S.W.3d at 795; Benjamin L. Harden, *Intellectual Disability (Mental Retardation), in Assessment of Childhood Disorders* 555 (Eric J. Mash & Russell A. Barkley eds., 4th ed. 2007); Benjamin J. Sadock & Virginia Alcott Sadock, *Concise Textbook of Child and Adolescent Psychiatry* 15 (10th ed. 2009).

the execution of persons convicted of first degree murder who were intellectually disabled when they committed the crime. As originally introduced in January 1990, Senate Bill 1851[16] and its companion, House Bill 2107,[17] contained a broad definition of "mental retardation." They stated that, for the purpose of the legislation,

> a person who has significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior shall be classified as mentally retarded. The mental retardation must have been manifested during the developmental period.

This definition was patterned after the definition of "mental retardation" then favored by the American Association on Mental Retardation ("AAMR").[18]

Following hearings on the proposed legislation, both the House Judiciary Committee and the Senate Judiciary Committee approved amendments to the legislation's definition of "mental retardation." These proposed amendments contained the following definition:

> For the purposes of this section, mental retardation is defined as:
> (1) Significantly subaverage general intellectual functioning; and
> (2) Deficits in adaptive behavior; and

---

[16]S.B. 1851, 96th General Assembly (1990) was filed for introduction on January 11, 1990. Senate Journal of the Ninety-Sixth General Assembly of the State of Tennessee, Second Regular Session 1927 ("Senate Journal").

[17]H.B. 2107, 96th General Assembly (1990) was filed for introduction on January 31, 1990. 1 House Journal of the Ninety-Sixth General Assembly of the State of Tennessee, Second Regular Session 2753 ("House Journal").

[18]The AAMD Manual defined "mental retardation" as "[s]ignificantly subaverage general intellectual functioning resulting in or associated with concurrent impairment in adaptive behavior and manifested during the developmental period." AAMD Manual, at 11. Both legislators and experts who discussed this definition referred to it as the "standard definition" and "nationally accepted definition" of the term. Statement of Representative Doug Jackson, House Judiciary Committee, Mar. 13, 1990; Statement of Representative Doug Jackson, House Session, Apr. 5, 1990; Testimony of Roger Blue, Senate Judiciary Committee, Mar. 13, 1990.

> (3)     The mental retardation must have been manifested during the developmental period, or by the age of eighteen (18).[19]

On April 5, 1990, the House of Representatives adopted the proposed amendment containing the revised definition of "mental retardation," passed House Bill 2107, and sent the bill to the Senate.[20]

The Senate took up House Bill 2107 on April 12, 1990. In addition to adopting the amendment containing the revised definition of "mental retardation" that had been approved by the House of Representatives on April 5, 1990,[21] the Senate adopted an additional amendment intended to provide a sharper focus for the definition of "mental retardation"[22] and passed the amended bill.[23]   As passed by the Senate, the definition of "mental retardation" read as follows:

> For the purposes of this section, mental retardation is defined as:
> (1)     Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below; and
> (2)     Deficits in adaptive behavior; and

---

[19]2 House Journal 3852; Senate Journal 3131.

[20]2 House Journal 3851-53; Senate Journal 2821.

[21]Senate Journal 3131-32.

[22]Senate Amendment No. 2 added the words "as evidenced by a functional intelligence quotient (I.Q.) of 70 or below." *See* Senate Journal 3134. This amendment was prompted by the concerns expressed by a state trial judge during the consideration of the bill in committee regarding the practical difficulties in applying the broad language "significantly subaverage general intellectual functioning." Statements of Senators Douglas Henry and Joe Haynes, Senate Session, Apr. 12, 1990. In his testimony before the Senate Judiciary Committee, Roger Blue, the executive director of the Arc of Tennessee, a non-profit group advocating on behalf of persons with intellectual and developmental disabilities, had testified that the use of I.Q. assessments, as a component of assessing "mental retardation," was consistent with the AAMR's definition of "mental retardation." Mr. Blue cautioned, however, that a general I.Q. score alone would not be enough in and of itself to demonstrate "mental retardation" and that the existence of deficits in adaptive behavior were also necessary. Testimony of Roger Blue, Senate Judiciary Committee, Mar. 13, 1990.

[23]Senate Journal 3134.

(3)     The mental retardation must have been manifested during the developmental period, or by the age of eighteen (18).[24]

When the amended bill was returned to the House of Representatives on April 12, 1990, the House concurred in the Senate amendments[25] and sent the bill to the governor. The governor signed the bill on May 1, 1990, and it is now codified at Tenn. Code Ann. § 39-13-203(2010).[26]

Other than a recent 2010 amendment to replace the term "mental retardation" with "intellectual disability,"[27] the statutory criteria for finding that a person is intellectually disabled have remained unchanged since 1990. Thus, for the purpose of determining whether a person was intellectually disabled at the time he or she committed first degree murder, the term "intellectual disability" now means:

(1)     Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
(2)     Deficits in adaptive behavior; and
(3)     The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.

Tenn. Code Ann. § 39-13-203(a).

The statute places the burden on the criminal defendant to prove by a preponderance of the evidence that he or she had an intellectual disability at the time of the offense and requires the trial court rather than the jury to make the decision. Tenn. Code Ann. § 39-13-203(c). However, it contains no explicit directions concerning the types of evidence that the trial court may consider to determine whether the defendant manifested "significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below" or whether the defendant manifested deficits in adaptive behavior.

---

[24]*See* Senate Journal 3131, 3134.

[25]2 House Journal 4322-23.

[26]Act of Apr. 12, 1990, ch. 1038, 1990 Tenn. Pub. Acts 730, 730-32.

[27]Act of Mar. 24, 2010, ch. 734, §§ 2-3, 2010 Tenn. Pub. Acts ___, ___.

## C.

Twelve years after the Tennessee General Assembly enacted Tenn. Code Ann. § 39-13-203, the United States Supreme Court revisited the issue of whether imposing the death penalty on persons who were intellectually disabled at the time of the offense violates the Eighth Amendment. Noting that "much [had] changed" since its decision in *Penry v. Lynaugh*,[28] the Court concluded that imposing the death penalty on persons with intellectual disability is "excessive" and, therefore, that the United States Constitution "'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Atkins v. Virginia*, 536 U.S. at 321 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)).

The Court recognized in *Atkins v. Virginia* that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders" as to whom there exists a national consensus prohibiting execution.[29] *Atkins v. Virginia*, 536 U.S. at 317. Despite Justice Scalia's dissent pointing out that historically only persons "within the 'profound' or 'severe' range of mental retardation" had been excused from criminal culpability,[30] the Court cited the current clinical definitions of "mental retardation" that were broad enough to include persons like Mr. Atkins who were "mildly mentally retarded." *Atkins v. Virginia*, 536 U.S. at 308 & n.3.[31]

The Court stopped short of formulating a national constitutional standard for determining whether a criminal defendant is intellectually disabled and, therefore, not subject to the death penalty. Instead, it left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins v. Virginia*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. at 405, 416-17); *see also Howell v. State*, 151 S.W.3d at 457.[32] It emphasized a general consensus in the states conforming their

---

[28]*Atkins v. Virginia*, 536 U.S. at 314.

[29]The Court in *Penry v. Lynaugh*, 492 U.S. at 338-39 similarly stated that "[i]n light of the diverse capacities and life experiences of mentally retarded persons, it cannot be said . . . that all mentally retarded people . . . can never act with the level of culpability associated with the death penalty."

[30]*Atkins v. Virginia*, 536 U.S. at 340-41 (Scalia, J., dissenting).

[31]The Court cited the AAMR's revised definition of "mental retardation," American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) ("1992 AAMR Manual") and the American Psychiatric Association's definition of "mental retardation." DSM-IV-TR, at 41.

[32]In another context, the United States Supreme Court noted that "[h]ow this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much the task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary."

(continued...)

statutes to the clinical definitions of "mental retardation" which required (1) subaverage intellectual functioning, (2) significant limitations in adaptive skills such as communication, self-care, and self-direction, and (3) manifestation of these disabilities before eighteen years of age. *Atkins v. Virginia*, 536 U.S. at 317-18 & n.22.

## D.

This Court's first occasion to construe and apply Tenn. Code Ann. § 39-13-203 came in 1994. Sylvester Smith was charged with the felony murder of an elderly widow. *State v. Smith*, 893 S.W.2d 908, 911 (Tenn. 1994). On the opening day of trial, he orally moved to prevent the State from seeking the death penalty on the ground that he was intellectually disabled.[33] Despite expert testimony that Mr. Smith was intellectually disabled, the trial court concluded that he was not. *State v. Smith*, 893 S.W.2d at 917. A jury thereafter found Mr. Smith guilty of felony murder and sentenced him to death.

Mr. Smith argued to this Court that the trial court has used "erroneous legal and medical standards" for determining whether he was intellectually disabled. He took particular issue with the trial court's conclusion that he had failed to prove "deficits in adaptive behavior" as required by Tenn. Code Ann. § 39-13-203(a)(2) and asserted that this Court should adopt the standards and definitions found in the AAMR's 1983 Manual. *State v. Smith*, 893 S.W.2d at 917.[34]

This Court noted that Tenn. Code Ann. § 39-13-203 does not "contain[] standards for evaluating the evidence offered to establish or disprove 'mental retardation'" and that the statute does not define the phrase "deficits in adaptive behavior." *State v. Smith*, 893 S.W.2d at 917. Over Justice Reid's dissent,[35] the Court declined to "place a technical gloss" on the statute because the General Assembly had neither defined "deficits in adaptive behavior" nor

---

[32](...continued)
*City of Cleburne, Tex. v. Cleburne Living Ctr., Inc.*, 473 U.S. at 442-43.

[33]Noting that the statute provided no direction concerning when the issue should be raised, the Court stated that "it would be preferable for the [d]efendant to raise the issue by written pretrial motion to allow the State time to marshal its evidence and to assure the trial court's determination is the result of a fair and thorough presentation of all evidence relevant to this issue." *State v. Smith*, 893 S.W.2d at 916 n.2.

[34]The State vigorously opposed Mr. Smith's reliance on the AAMR Manual because it had not been introduced into evidence and had not been relied upon in the proceedings in the lower courts. *State v. Smith*, 893 S.W.2d at 917.

[35]Justice Reid pointed out that the phrase "deficits in adaptive behavior" was a "well-defined term of art" found in the AAMR Manual and that the definition in Tenn. Code Ann. § 39-13-203 "closely tracks" the AAMR's definition. *State v. Smith*, 893 S.W.2d at 929 (Reid, J., dissenting).

made explicit reference to the materials in which the definition or standards could be found. *State v. Smith*, 893 S.W.2d at 917. Accordingly, after noting that "[a] statutory definition of the term 'deficits in adaptive behavior' would aid both the trial court and appellate review," the Court construed the phrase to mean "the inability of an individual to behave so as to adapt to surrounding circumstances." *State v. Smith*, 983 S.W.2d at 918.

Mr. Smith filed a petition for rehearing. Justice Reid prepared a separate opinion stating that he would grant the petition and remand the case to the trial court to determine whether Mr. Smith was a person with intellectual disability. In his opinion, Justice Reid cited numerous instances in the legislative history of Tenn. Code Ann. § 39-13-203 where the bill's sponsors and other experts stated that the terminology of the bill was "of a technical nature" and that the statutory definition is the same as the AAMR's "universally accepted definition used in the field." *State v. Smith*, 893 S.W.2d at 934-35 (Reid, J., dissenting). Apparently conceding Justice Reid's argument that the statute was based on the AAMR's definition, the Court simply observed that "[e]ven under the AAMR definition, . . . the [d]efendant has failed to establish that he suffered deficits in adaptive behavior." *State v. Smith*, 983 S.W.2d at 933.

Seven years following *State v. Smith* and one year before the United States Supreme Court handed down *Atkins v. Virginia*, this Court again turned its attention to Tenn. Code Ann. § 39-13-203 in *Van Tran v. State*. Adopting an approach that differed significantly from the approach employed in *State v. Smith*, the Court, in a divided opinion, determined that imposing the death penalty on persons who were intellectually disabled at the time of the offense violated the prohibition against cruel and unusual punishment in Article I, Section 16 of the Tennessee Constitution. *Van Tran v. State*, 66 S.W.3d at 812. The Court also reversed the lower courts' dismissal of Mr. Van Tran's petition for post-conviction relief and remanded the case to the trial court for a hearing on Mr. Van Tran's intellectual disability. *Van Tran v. State*, 66 S.W.3d at 812.

This Court noted in *Van Tran v. State* that Tennessee had adopted the "nationally accepted definition of mental retardation" when it enacted Tenn. Code Ann. § 39-13-203. *Van Tran v. State*, 66 S.W.3d at 793 n.2. While eschewing any intent to "expand[] or interpret[] the statutory definition,"[36] the Court cited repeatedly to the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (1994) ("DSM-IV") to provide understanding and context regarding the nature of intellectual disability and its clinical definition.

With regard to Tenn. Code Ann. § 39-13-203(a)(1)'s requirement of "significantly subaverage general intellectual functioning," the Court, citing the DSM-IV, stated that this

---

[36] *Van Tran v. State*, 66 S.W.3d at 795 n.4.

requirement is "based on [I.Q.] scores that are obtained through the use of standardized intelligence tests." *Van Tran v. State*, 66 S.W.3d at 795. With regard to Tenn. Code Ann. § 39-13-203(a)(2)'s requirement of "deficits in adaptive behavior," the Court, again citing the DSM-IV rather than *State v. Smith*, stated that "deficits in adaptive behavior"

> "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting" . . . . As discussed, a mentally retarded person will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, and the mental disorders and general medical conditions that may coexist with [m]ental [r]etardation."

*Van Tran v. State*, 66 S.W.3d at 795. Based on this understanding of the nature of intellectual disability, the Court noted that while there may be varying degrees of intellectual disability, it is a "nationally recognized fact that every person who is mentally retarded has significant and serious impairments to intelligence and everyday functioning." *Van Tran v. State*, 66 S.W.3d at 796.

Turning to the legislative history of the enactment of Tenn. Code Ann. § 39-13-203, the Court concluded that the Tennessee General Assembly intended to repudiate the United States Supreme Court's holding in *Penry v. Lynaugh* and to reflect the emerging view of Tennesseans that persons with intellectual disability should not be subjected to capital punishment. *Van Tran v. State*, 66 S.W.3d at 804-05. Accordingly, the Court determined that Article I, Section 16 of the Constitution of Tennessee prohibited the State from executing criminal defendants who were intellectually disabled when they committed first degree murder. *Van Tran v. State*, 66 S.W.3d at 811-12.

The Court also determined that its holding announced a new rule of constitutional proportion and, therefore, that the rule should be retroactively applied to cases pending on collateral review. *Van Tran v. State*, 66 S.W.3d at 811. Accordingly, the Court held that fundamental fairness required giving Mr. Van Tran an opportunity to litigate his claim that he was a person with intellectual disability under Tenn. Code Ann. § 39-13-203(a). The Court remanded the case to the trial court with directions to address the question of Mr. Van Tran's intellectual disability. The Court noted that the

applicable criteria are those presently set forth by statute: (1) significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy or below; (2) deficits in adaptive behavior; and (3) mental retardation manifested during the developmental period, or by eighteen years of age.

*Van Tran v. State*, 66 S.W.3d at 812.[37]

This Court's third opportunity to address Tenn. Code Ann. § 39-13-203 came two years after the United States Supreme Court handed down its opinion in *Atkins v. Virginia*. Michael Wayne Howell urged the Court to construe Tenn. Code Ann. § 39-13-203(a)(1) to be satisfied whenever a defendant's I.Q. test score was below seventy-five.[38] *See Howell v. State*, 151 S.W.3d at 457-58. The Court declined to adopt this interpretation and instead concluded that Tenn. Code Ann. § 39-13-203(a)(1) provides "a clear and objective guideline to be followed by the courts when applying the [statutory] three-prong test." *Howell v. State*, 151 S.W.3d at 458.[39]

In reaching this conclusion, the Court conceded that "mental retardation is a difficult condition to accurately define." *Howell v. State*, 151 S.W.3d at 457.[40] However, citing *Atkins v. Virginia*, 536 U.S. at 308 n.3, the Court pointed with favor to both the AAMR's and the American Psychological Association's definition of "mental retardation" as "significantly subaverage intellectual functioning accompanied by related limitations in two or more adaptive skill areas (such as self-care, communication, or social skills), and manifestation of the condition before age 18." *Howell v. State*, 151 S.W.3d at 457 & n.4.

---

[37]On remand, the trial court denied Mr. Van Tran's motion to reopen his post-conviction proceeding after concluding that he had failed to prove that he was intellectually disabled under Tenn. Code Ann. § 39-13-203. The Court of Criminal Appeals affirmed this decision. *Van Tran v. State*, No. W2005-01334-CCA-R3-PD, 2006 WL 3327828 (Tenn. Crim. App. Nov. 9, 2006), *perm. app. denied* (Tenn. Apr. 16, 2007).

[38]Mr. Howell based this argument on his assertion that the standard error of measurement of a standardized I.Q. test was five points. *Howell v. State*, 151 S.W.3d at 453-54, 456.

[39]After noting that Tenn. Code Ann. § 39-13-203 did not refer to a standard error of measurement in I.Q. test scores or to the "consideration of any range of scores above the score of seventy," the Court "decline[d] to 'read in' such provisions . . . to extend the coverage of the statute." *Howell v. State*, 151 S.W.3d at 458.

[40]The AAIDD has likewise observed that "[j]ust as defining intelligence has proven to be a challenging task, measuring or quantifying intelligence is equally difficult." AAIDD Manual, at 35.

With specific regard to Tenn. Code Ann. § 39-13-203(a)(1), the Court observed that it was constitutionally permissible to use I.Q. test scores to determine whether a criminal defendant is a person with significantly subaverage general intellectual functioning. *Howell v. State*, 151 S.W.3d at 459. The Court also noted that Tenn. Code Ann. § 39-13-203 did not "provide a clear directive regarding which particular test or testing method [should] be used." *Howell v. State*, 151 S.W.3d at 459.[41] Accordingly, the Court held that trial courts may give more weight to one test over others but should do so only after fully analyzing and considering all the evidence presented, including all the tests administered to the criminal defendant. *Howell v. State*, 151 S.W.3d at 459.[42]

After announcing these principles, the Court turned its attention to the evidence regarding Mr. Howell's intellectual disability. Noting that one clinical psychologist had testified that Mr. Howell's I.Q. was 91 while another clinical neuropsychologist had testified that his I.Q. scores ranged between 62 and 73, the Court concluded that Mr. Howell had presented a colorable claim that he was intellectually disabled and, therefore, that he was entitled to an evidentiary hearing. *Howell v. State*, 151 S.W.3d at 463.

The fourth and final case requiring us to interpret and apply Tenn. Code Ann. § 39-13-203 is *State v. Strode*, 232 S.W.3d 1 (Tenn. 2007). Danny Strode was charged with premeditated murder and murder in the perpetration of an especially aggravated robbery. After the State filed its notice of intention to seek the death penalty, he filed a motion to strike the notice on the ground that he was intellectually disabled under Tenn. Code Ann. § 39-13-203. To support his claim, Mr. Strode presented a clinical psychologist who testified that Mr. Strode's I.Q. three years after the crime was 69. While conceding that the records he examined did not show that Mr. Strode was intellectually disabled prior to eighteen years of age, *State v. Strode*, 232 S.W.3d at 5, the psychologist insisted that the relevant time for the manifestation of intellectual disability was "during the developmental period."[43] He testified that the brain did not fully mature until twenty-four to twenty-six years of age and, therefore, that his 2004 diagnosis that Mr. Strode was intellectually disabled at the age of twenty-three satisfied Tenn. Code Ann. § 39-13-203(a)'s criteria for a finding of intellectual disability. *State v. Strode*, 232 S.W.3d at 5.

---

[41] In his separate opinion, Justice Drowota called upon the General Assembly "to consider designating a test or tests for courts to consider." He observed that without such a designation, determinations regarding whether a criminal defendant is intellectually disabled "likely will continue to be plagued with confusion and uncertainty." *Howell v. State*, 151 S.W.3d at 469 n.5 (Drowota, J., concurring in part and dissenting in part).

[42] This Court noted in *Howell v. State* that the definition of "mental retardation" with regard to the provision of social services was "less restrictive" than Tenn. Code Ann. § 39-13-203 because it did not link "significantly sub-average intellectual functioning" to a specific functional intelligence quotient. *Howell v. State*, 151 S.W.3d at 458.

[43] *See* Tenn. Code Ann. § 39-13-203(a)(3).

The trial court concluded that Mr. Strode was intellectually disabled for the purpose of Tenn. Code Ann. § 39-13-203. The State pursued a Tenn. R. App. P. 9 interlocutory appeal. The Court of Criminal Appeals reversed the trial court after concluding that Tenn. Code Ann. § 39-13-203(a)(3) required a finding of intellectual disability prior to eighteen years of age and that evidence did not support the trial court's conclusion that Mr. Strode's intellectual disability had manifested itself prior to the age of eighteen. *State v. Strode*, 232 S.W.3d at 7-8.[44]

Mr. Strode's appeal to this Court raised two issues regarding the proper interpretation of Tenn. Code Ann. § 39-13-203.[45] The first issue was whether Tenn. Code Ann. § 39-13-203(f) permitted the State's interlocutory appeal. The second issue was whether the Court of Criminal Appeals had correctly interpreted the statute to require that the intellectual disability manifest itself before the person's eighteenth birthday.

With regard to the first issue, this Court, interpreting the plain language of Tenn. Code Ann. § 39-13-203(f),[46] held that the statutory prohibition against interlocutory appeals applied only when a trial court determined that a criminal defendant was not a person with intellectual disability and, therefore, that the statute did not apply when a trial court determined that a defendant was intellectually disabled. In light of the fact that the trial court had found Mr. Strode to be intellectually disabled, we concluded that Tenn. Code Ann. § 39-13-203(f)'s prohibition against interlocutory appeals did not apply and that the State's interlocutory appeal was proper. *State v. Strode*, 232 S.W.3d at 9-10.

With regard to the second issue, we found that Tenn. Code Ann. § 39-13-203(a)(3) was ambiguous because it was susceptible of two interpretations. *State v. Strode*, 232 S.W.3d at 12. Accordingly, to ascertain the General Assembly's intended purpose for Tenn. Code Ann. § 39-13-203(a)(3), we consulted the statute's legislative history and determined that "it is clear that the Legislature did not intend for the term 'developmental period' to extend beyond eighteen years of age." *State v. Strode*, 232 S.W.3d at 13. We confirmed our

---

[44]*See also State v. Strode*, No. M2005-00906-CCA-R9-DD, 2006 WL 1626919, at *9-15 (Tenn. Crim. App. June 8, 2006).

[45]Referencing *Howell v. State*, this Court noted in *State v. Strode* that the General Assembly had employed a "more restrictive" definition of "mental retardation" for the purpose of excluding persons from capital punishment than for eligibility for social services. We again based this conclusion on the fact that the definition of "mental retardation" in Tenn. Code Ann. § 39-13-203(a) included a specific functional intelligence quotient, while Tenn. Code Ann. § 33-1-101(16) (Supp. 2010) did not. *State v. Strode*, 232 S.W.3d at 14.

[46]At the time of this Court's decision, Tenn. Code Ann. § 39-13-203(f) stated: "The determination of the trier of fact that the defendant is not mentally retarded shall not be appealable by interlocutory appeal, but may be a basis of appeal by either the state or defendant following the sentencing stage of the trial."

interpretation of the statute with references to its legislative history, materials prepared by the AAMR and the American Psychiatric Association, our prior opinions, and the statutes and case law in other jurisdictions. *See State v. Strode*, 232 S.W.3d at 13-16. Based on our interpretation of Tenn. Code Ann. § 39-13-203(a), we concluded, like the Court of Criminal Appeals, that the evidence preponderated against the trial court's finding that Mr. Strode had proved that his subaverage general intellectual functioning and his deficits in adaptive behavior manifested themselves before his eighteenth birthday. *State v. Strode*, 232 S.W.3d at 18.

Viewed together, these four decisions reflect the following six principles that have guided our approach to the application and interpretation of Tenn. Code Ann. § 39-13-203:

(1)     The public policy of this State, reflected in the considered decision of the Tennessee General Assembly to enact Tenn. Code Ann. § 39-13-203, opposes the execution of persons with intellectual disabilities.[47]

(2)     The scope of Tenn. Code Ann. § 39-13-203 is more restrictive than the definition of "intellectual disability" in Tenn. Code Ann. § 33-1-101(16) applicable to the provision of support services to persons with intellectual disabilities.[48]

(3)     The Court will give effect to the plain and ordinary meaning of the statute's language.[49]

(4)     The Court will decline to "read in" language into the statute that the General Assembly did not place there.[50]

(5)     The Court's application of the statute may be guided and informed by the clinical standards, criteria, and practices customarily used to assess and diagnose intellectual disability.[51]

---

[47]*See Van Tran v. State*, 66 S.W.3d at 804-05, 812.

[48]*State v. Strode*, 232 S.W.3d at 14; *Howell v. State*, 151 S.W.3d at 458.

[49]*See State v. Strode*, 232 S.W.3d at 9-12; *Howell v. State*, 151 S.W.3d at 458; *State v. Smith*, 893 S.W.2d at 917.

[50]*See Howell v. State*, 151 S.W.3d at 457-58.

[51]*See State v. Strode*, 232 S.W.3d at 6, 12-14; *Van Tran v. State*, 66 S.W.3d 794-796.

(6)     In instances where the proper application of the statute is not clear, the Court may confirm its interpretation of the statute by considering its legislative history, prior interpretations of the statute, similar statutes in other jurisdictions, and the clinical standards, criteria, and practices customarily used to assess and diagnose intellectual disability.[52]

**E.**

In the years following *Howell v. State*, some trial courts and the Court of Criminal Appeals have construed our holding that Tenn. Code Ann. § 39-13-203(a)(1) provided a "clear and objective guideline" for determining whether a criminal defendant is a person with intellectual disability[53] to have established a mandatory requirement that only raw I.Q. test scores may be used to determine whether a criminal defendant has "significantly impaired general intellectual functioning" and that a raw I.Q. test score above seventy (70) may be sufficient, by itself, to disprove a criminal defendant's claim that he or she is a person with intellectual disability. In two recent opinions, the Court of Criminal Appeals has expressed concern that such "bright-line cutoff" requirements raise the specter of the possible execution in Tennessee of persons who are intellectually disabled. *Smith v. State*, No. E2007-00719-CCA-R3-PD, 2010 WL 3638033, at *40 (Tenn. Crim. App. Sept. 21, 2010) *perm. app. granted* (Tenn. Mar. 3, 2011); *Cribbs v. State*, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *40 (Tenn. Crim. App. Mar. 4, 2008), *perm. app. denied* (Tenn. 2009).[54] This case provides us with an opportunity to revisit the question of the types of evidence that may be presented with regard to the criterion in Tenn. Code Ann. § 39-13-203(a)(1).

For the purposes of Tenn. Code Ann. § 39-13-203(a)(1), a criminal defendant has "[s]ignificantly subaverage general intellectual functioning" if he or she had a "functional intelligence quotient of seventy (70) or below" at the time the crime was committed. While a person's I.Q. is customarily obtained using standardized intelligence tests, *see Van Tran v. State*, 66 S.W.3d at 795; DSM-IV-TR, at 41, the statute does not provide clear direction regarding how a person's I.Q. should be determined and does not specify any particular test or testing method that should be used. *Howell v. State*, 151 S.W.3d at 459. In fact, the statute does not even employ the words "test" or "score."

---

[52]*See State v. Strode*, 232 S.W.3d at 12-16.

[53]*Howell v. State*, 151 S.W.3d at 458.

[54]Unlike the present case, the trial court in *Cribbs v. State* considered the expert testimony indicating that the defendant's I.Q. was higher (the State's expert) or lower (the defendant's expert) than the defendant's raw I.Q. score, finding the State's expert convincing and the defense expert to not be credible. *Cribbs v. State*, 2009 WL 1905454, at *17, *22, *32.

When construing a statute, we generally (1) give the words their natural and ordinary meaning, (2) consider the words in the context of the statute, and (3) presume the General Assembly intended each word to be given full effect. *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 176 (Tenn. 2008). Just as we may not overlook or ignore any of the words in a statute, *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005) (noting that every word of a statute should be given full effect if doing so does not violate the obvious intention of the General Assembly), we must be circumspect about adding words to a statute that the General Assembly did not place there. *See City of Knoxville v. Entm't Res., LLC*, 166 S.W.3d 650, 658 (Tenn. 2005); *Howell v. State*, 151 S.W.3d at 457-58.

The criterion in Tenn. Code Ann. § 39-13-203(a)(1) requires a "functional intelligence quotient of seventy (70) or below." The statute does not require a "functional intelligence quotient *test score* of seventy (70) or below." Because the statute does not specify how a criminal defendant's functional I.Q. should be determined, we have concluded that the trial courts may receive and consider any relevant and admissible evidence regarding whether the defendant's functional I.Q. at the time of the offense was seventy (70) or below.

Ascertaining a person's I.Q. is not a matter within the common knowledge of lay persons. Expert testimony in some form will generally be required to assist the trial court in determining whether a criminal defendant is a person with intellectual disability for the purpose of Tenn. Code Ann. § 39-13-203(a). *State v. Velda*, 777 N.W.2d 266, 306 (Neb. 2010); *State v. Lott*, 2002 OH 6625, ¶ 18, 779 N.E.2d 1011, 1015; *see also Maldonado v. Thaler*, 625 F.3d 229, 233 (5th Cir. 2010); *People v. Superior Court*, 155 P.3d 259, 265-67 & n.6 (Cal. 2007); Jessica Hudson et al., *Lightning But No Thunder: The Need for Clarity in Military Courts Regarding the Definition of Mental Retardation in Capital Cases and for Procedures in Implementing* Atkins v. Virginia, 55 Naval L. Rev. 359, 385 n.139 (2008). Expert testimony that meets the requirements of Tenn. R. Evid. 702 and 703, unless otherwise barred, is admissible and may be considered by the trial court for the purpose of determining a defendant's functional I.Q. However, consistent with the plain language to Tenn. Code Ann. § 39-13-203(a)(1), as interpreted in *Howell v. State*, an expert's opinion regarding a criminal defendant's I.Q. cannot be expressed within a range (i.e., that the defendant's I.Q. falls somewhere between 65 to 75) but must be expressed specifically (i.e., that the defendant's I.Q. is 75 or is "seventy (70) or below" or is above 70).

In formulating an opinion regarding a criminal defendant's I.Q. at the time of the offense, experts may bring to bear and utilize reliable practices, methods, standards, and data that are relevant in their particular fields. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997);

*see also State v. Scott*, 275 S.W.3d 395, 401-10 (Tenn. 2009).[55]  Of course, the soundness of any particular expert's opinion regarding a defendant's I.Q. may be tested by vigorous cross-examination.  *State v. Scott*, 275 S.W.3d at 410.  In the final analysis, the trial court is not required to follow the opinion of any particular expert, *see State v. Flake*, 88 S.W.3d 540, 556 (Tenn. 2002), but must give full and fair consideration to all the evidence presented, including the results of all the I.Q. tests administered to the defendant.  *See Howell v. State*, 151 S.W.3d at 459.

**F.**

In addition to adhering to the language of the statute, interpreting Tenn. Code Ann. § 39-13-203 to permit qualified experts to testify regarding a criminal defendant's specific "functional intelligence quotient" based on the exercise of their clinical judgment is consistent with the statute's legislative history.  Our interpretation also points to the difference between Tenn. Code Ann. § 39-13-203 and the statutes in other states that expressly require the consideration of scores on intelligence tests.  Finally, our interpretation of Tenn. Code Ann. § 39-13-203 is consistent with the current clinical approach to the diagnosis and assessment of intellectual disability and with current practice reflected in a number of Tennessee cases where the parties themselves have taken issue with the validity and weight of raw scores of intelligence tests.

---

[55]The AAIDD currently recognizes ten potential "challenges" to the reliability and validity of I.Q. test scores.  AAIDD Manual, at 36-41.  Among these challenges are the standard error of measurement, the Flynn Effect, and the practice effect.  The Flynn Effect refers to the observed phenomenon that I.Q. test scores tend to increase over time.  Thus, the most current versions of a test should be used at all times and, when older versions of the test are used, the scores must be correspondingly adjusted downward.  AAIDD Manual, at 37; *see also Coleman v. State*, 2010 WL 118696, at *16-18.  The practice effect refers to increases in I.Q. test scores that result from a person's being retested using the same or a similar instrument.  AAIDD Manual, at 38.

Accordingly, if the trial court determines that professionals who assess a person's I.Q. customarily consider a particular test's standard error of measurement, the Flynn Effect, the practice effect, or other factors affecting the accuracy, reliability, or fairness of the instrument or instruments used to assess or measure the defendant's I.Q., an expert should be permitted to base his or her assessment of the defendant's "functional intelligence quotient" on a consideration of those factors.

## Legislative History

The committee hearings and floor debates regarding Tenn. Code Ann. § 39-13-203 are consistent with our understanding of the purpose of the statute. They reflect an awareness and understanding that determining a criminal defendant's functional I.Q. would not be limited to raw scores on I.Q. tests.

Testifying before the Senate Judiciary Committee, Roger Blue, the executive director of the Arc of Tennessee, expressed his professional opinion that whether an individual is intellectually disabled will be determined using "a very specific kind of evaluation. It is based upon a whole battery of testing that has to be done not just on intelligence . . . [but also on a] whole battery of exams on adaptive behavior."[56] With regard to borderline cases where a defendant has been found competent to stand trial, Mr. Blue pointed out that "the burden of proof by preponderance of the evidence . . . really is going to force them [the clinicians] to do all of the testing that is necessary."[57]

Similarly, during the consideration of the legislation on third and final reading by the House of Representatives, Representative Jackson, the legislation's House sponsor, pointed out that under the legislation, intellectual disability will be established "by testing and diagnosis, and it is done by standardized practices within the profession."[58] Later in the discussion, Representative Jackson noted that a criminal defendant would prove "through expert testimony that he [or she] is mentally retarded."[59]

## Other State Statutes

When the Tennessee General Assembly enacted Tenn. Code Ann. § 39-13-203, it purposefully chose language that did not expressly equate a criminal defendant's "functional intelligence quotient" to an I.Q. test score. In this regard, Tennessee's statute differs from statutes in other states requiring that decisions regarding a defendant's intellectual disability be based on the defendant's score on an I.Q. test. For example, Oklahoma's statute provides:

> An intelligence quotient of 70 or below on an individually administered, scientifically recognized standardized intelligence quotient test administered by a licensed psychiatrist

---

[56]Testimony of Roger Blue, Senate Judiciary Committee, Mar. 13, 1990.

[57]Testimony of Roger Blue, Senate Judiciary Committee, Mar. 13, 1990.

[58]Statement of Representative Doug Jackson, House Session, Apr. 5, 1990.

[59]Statement of Representative Doug Jackson, House Session, Apr. 5, 1990.

or psychologist is evidence of significantly subaverage general intellectual functioning . . . .

However, in no event shall a defendant who has received an intelligence quotient of seventy-six (76) or above on any individually administered, scientifically recognized, standardized intelligence quotient test administered by a licensed psychiatrist or psychologist, be considered mentally retarded and, thus, shall not be subject to any proceedings under this section.

Okla. Stat. tit. 21, § 701.10b(C) (Supp. 2011). The statutes in eight other states contain similar limitations to the assessment of a criminal defendant's I.Q. *See* Ariz. Rev. Stat. Ann. § 13-753(F) (2010); *see also* Fla. Stat. § 921.137(1) (Supp. 2011); Md. Code, Criminal Law, § 2-202 (b)(1)(I) (Supp. 2010); Neb. Rev. St. § 28-105.01(3) (2008); N.M. Stat. Ann. § 31-9-1.6(E) (2009); N.C. Gen. Stat. § 15A-2005 (a)(2) (2009); S.D. Codified Laws § 23A-27A-26.2 (2004); Va. Code Ann. § 19.2-264.3:1.1 (A), (B) (Supp. 2010).

These statutes demonstrate that legislative bodies desiring to base determinations of a criminal defendant's intellectual disability on his or her I.Q. test scores have been able to craft statutes clearly reflecting their intent. The Tennessee General Assembly is no less adept at drafting statutes using plain and ordinary language that clearly reflects its intent and purpose. In the absence of statutory language expressly restricting determinations regarding whether a defendant has "significantly subaverage general intellectual functioning" to the consideration of the defendant's I.Q. test scores, we can only conclude that the General Assembly envisioned that the courts would make these fact-intensive and complex decisions with the assistance of experts in the field.

### Current Clinical Practice

Our interpretation of Tenn. Code Ann. § 39-13-203(a) is also consistent with current clinical practice related to the diagnosis and assessment of intellectual disability. We have previously noted that the scientific understanding of intellectual disability will advance over time. *Howell v. State*, 151 S.W.3d at 457.[60] In fact, in the seven years following the *Howell* decision, the clinical understanding of the causes and effects of intellectual disability has continued to advance.[61]

---

[60]*See also Kansas v. Crane*, 534 U.S. 407, 413 (2002) (citing *Kansas v. Hendricks*, 521 U.S. 346, 359 (1997) (noting that the science of psychiatry is an ever-advancing science)).

[61]See AAIDD Manual, at xiii, 11.

While the definition of "intellectual disability" has changed over time, the three essential criteria of ascertaining whether a person is intellectually disabled continue to remain relatively constant.[62] These criteria include: (1) significant limitations on intellectual functioning, (2) significant limitations on adaptive behavior, and (3) onset of disability before eighteen years of age.[63]

The current definition of "intellectual disability" adopted by the AAIDD is:

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

AAIDD Manual, at 1.[64] Similarly, the American Psychiatric Association has defined "intellectual disability" as a

> disorder . . . characterized by significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning.

DSM-IV-TR, at 39, 41.

Assessments of intellectual functioning must be based on sound procedures and may, at times, require information from multiple sources.[65] They currently include standardized, individually administered intelligence tests that provide a "global (general factor) IQ measure

---

[62]AAIDD Manual, at 7, 27.

[63]AAIDD Manual, at 5, 28.

[64]The AAIDD definition also includes five assumptions that clarify the context from which the definition arises and indicate how the definition should be applied. AAIDD Manual, at 6. These assumptions are: (1) limitations in present functioning must be considered within the context of community environments typical of the individual's age, peers, and culture; (2) valid assessment considers cultural and linguistic diversity as well as differences in communication, sensory, motor, and behavioral factors; (3) within an individual, limitations often coexist with strengths; (4) an important purpose of describing limitations is to develop a profile of needed supports; and (5) with appropriate personalized supports over a sustained period, the life functioning of the person with intellectual disability generally will improve. AAIDD Manual, 1, 6-7.

[65]AAIDD Manual, at 41.

of intellectual functioning."[66]  Even though the results of these tests – I.Q. scores – are "far from perfect,"[67] these tests are currently the best method for ascertaining the extent of limitations on a person's intellectual functioning.

Intelligence tests do not measure intelligence directly in the same way that a clinician can use a test to measure blood pressure or cholesterol.[68]  Rather, clinicians infer intelligence from how a person performs on the test.[69]  Because intelligence tests are indirect rather than direct measures of intelligence,[70] experts in the field recognize that they, like other measures of human functioning, are not "actuarial determination[s],"[71] that these tests cannot measure intelligence with absolute precision,[72] and that these tests contain a potential for error.[73]  The current consensus is that the standard error of measurement in well-standardized intelligence tests is approximately three to five points.[74]

---

[66]AAIDD Manual, at 41.

[67]AAIDD Manual, at 31, 35-37.

[68]Phil Foreman, *Education of Students With an Intellectual Disability: Research and Practice* 69 (2009).

[69]Earl Hunt, *Intelligence* 7-8 (2011).

[70]Mike Anderson, *Individual Differences in Intelligence*, *in Implicit and Explicit Mental Processes* 172 (Kim Kirsner et al. eds. 1998); Marla B. Sokolowski & Douglas Wahlsten, *Gene Environment Interaction and Complex Behavior, in Methods in Genomic Neuroscience* 11 (Hemin R. Chin & Steven O. Moldin eds. 2001).

[71]AAIDD Manual, at 40.

[72]James C. Harris, *Intellectual Disability: Understanding Its Development, Causes, Classification, Evaluation and Treatment* 45 (2006); Nicky Hayes, *Foundations of Psychology* 184 (3d ed. 2000).

[73]DSM-IV-TR, at 12; American Association on Mental Retardation, *Mental Retardation: Definition Classification and Systems of Supports* 57, 59 (10th ed. 2002) ("2002 AAMR Manual"); Letter from AAIDD 11th Ed. Implementation Committee to DSM-V ASD and Development Disorders Subgroup, ID Committee (Feb. 22, 2010), http://www.aaidd.org/Media/PDFs/DSMV.pdf; Caroline Everington & J. Gregory Olley, *Implications of* Atkins v. Virginia: *Issues in Defining and Diagnosing Mental Retardation*, 8 J. Forensic Psychology Practice 1, 6 (2008).

[74]AAIDD Manual, at 36; DSM-IV-TR, at 41; Lewis R. Aiken, *Assessment of Intellectual Functioning* 42 (2d ed. 1996).

According to the AAIDD, the "significant limitations in intellectual functioning" criterion for the diagnosis of intellectual disability is an I.Q. score that is "approximately[75] two standard deviations below the mean, considering the standard error of measurement for the specific instruments used and the strengths and limitations of the instruments."[76] Thus both the AAIDD and the American Psychiatric Association state that the best practice is to report I.Q. scores with an associated confidence interval.[77] AAIDD Manual, at 36.

At one time, intellectual disability was diagnosed using I.Q. test scores alone. Approximately fifty years ago, clinicians began considering a person's adaptive behavior along with I.Q. test scores because of decreasing confidence in using these scores as the sole measure of a person's intelligence.[78] Clinicians decided that considering a person's adaptive behavior along with I.Q. test scores would decrease the number of false positives occurring when only I.Q. test scores were considered.[79]

Clinicians are often called upon to make difficult and high stakes decisions relating to the diagnosis or assessment of intellectual disability. The difficulty of this task "is often

---

[75]The AAIDD emphasizes that the use of the word "approximately" "reflects the role of clinical judgment in weighing the factors that contribute to the validity and precision of a decision. The term also addresses statistical error and uncertainty inherent in any assessment of human behavior. In that regard, the decision-making process cannot be viewed as only a statistical calculation." AAIDD Manual, at 35, 40.

[76]AAIDD Manual, at 27, 35; *see also* DSM-IV-TR, at 41.

[77]A "confidence interval" is

An estimate, expressed in a range, for a quantity in a population. If an estimate from a large sample is unbiased, a 95% confidence interval" is the range from about two standard errors below to two standard errors above the estimate. Intervals obtained this way cover the true value about 95% of the time, and 95% is the "confidence level" or the "confidence coefficient."

David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* Federal Judicial Center, *Reference Manual on Scientific Evidence* 161 (2d ed. 2000), available at http://www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf; *see also* 3 Oxford English Dictionary 706 (2d ed. 1989) (defining a confidence interval as "a range of values so defined that there is a specified probability that the value of a parameter of a population lies within it").

[78]AAIDD Manual, at 43-44.

[79]John H. Blume et al., *Of* Atkins *and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 Cornell J.L. & Pub. Pol'y 689, 704 n.72 (2009) ("*Of* Atkins *and Men*"); *see also* Randy W. Kamphaus, *Clinical Assessment of Child and Adolescent Intelligence* 586 (2d ed. 2005) (noting that "[t]he practice of using intelligence tests in isolation is analogous to using only the LDL serum cholesterol level to diagnose risk of heart disease. It is now clear that other factors (e.g., HDL) must be considered").

compounded by thinking errors that bias one's decision or recommendation and [by] having to make decisions based on incomplete information or situational factors that result in uncertainty, imprecision, and ambiguity." AAIDD Manual, at 102. Accordingly, both the AAIDD and the American Psychiatric Association now emphasize the importance of clinical judgment in diagnosing and assessing intellectual disability.[80] Clinical judgment becomes particularly important in assessing borderline cases.[81]

Clinical judgment is based on a clinician's training, experience, and specific knowledge of the person being evaluated and the person's environment.[82] It enables the clinician to properly interpret the scores and results from the standardized tests.[83] Thus, the exercise of clinical judgment promotes the clinician's use of strategies that will assist in making accurate, valid, and precise decisions and recommendations within the framework of the best practices in the field of intellectual disability, professional ethics, and professional standards.[84] The amount of emphasis placed on clinical judgment in a particular case will vary depending on the type and amount of information available, the complexity of the issue, and the presence of one or more challenging conditions or situations.[85]

Our construction of Tenn. Code Ann. § 39-13-203(a) is consistent with the current emphasis on clinical judgment in the assessment of borderline cases of intellectual disability. Aligning the application of the statute with the clinical approach to diagnosing and assessing intellectual disability will result in more accurate and consistent decisions. While Tenn. Code Ann. § 39-13-203(a)(1) is substantially consistent with clinical practice, it differs in one material respect. Clinicians diagnosing intellectual disability generally report their conclusions within a range (a person's I.Q. is between 65 and 75). Tenn. Code Ann. § 39-13-203(a)(1) requires clinicians to give more definite testimony. They must testify to a specific score or at least that the criminal defendant's "functional intelligence quotient" is either "seventy (70) or below" or above seventy.

---

[80]AAIDD Manual, at 86 (stating that "[c]linical judgment is a key component . . . of professional responsibility in the field of "[intellectual disability]"); Dawn P. Flanagan & Alan S. Kaufman, *Essentials in WISC-IV Assessment* 250 (2d ed. 2009).

[81]2002 AAMR Manual, at xi; Mary Beirne-Smith et al., *Mental Retardation: An Introduction to Intellectual Disabilities* 58-59 (2006); Vincent B. Van Hasselt & Michael Hersen, *Handbook of Adolescent Psychopathology: A Guide to Diagnosis and Treatment* 497-98 (1995).

[82]AAIDD Manual, at 86.

[83]AAIDD Manual, at 35.

[84]AAIDD Manual, at 87, 102.

[85]AAIDD Manual, at 103.

**Current Litigation Practice**

Finally, our review of all the cases involving the application of Tenn. Code Ann. § 39-13-203 reflect that the parties and the courts have not been limiting their consideration of whether a criminal defendant has a "functional intelligence quotient of seventy (70) or below" to the defendant's raw I.Q. test scores. Even though the State is asserting here that raw I.Q. test scores are the sine qua non for determinations under Tenn. Code Ann. § 39-13-203(a)(1), it has not been hesitant in other cases to present evidence challenging the accuracy of I.Q. test scores that are not favorable to its position.

For example, in *Cribbs v. State*, both the State and Mr. Cribbs presented evidence that his raw I.Q. test scores did not accurately reflect his actual I.Q. On behalf of the State, Dr. Wyatt Nichols stated that Mr. Cribbs's intellectual level was actually higher than the I.Q. test score of 73 and was "[m]ore like the mid to high 80s." *Cribbs v. State*, 2009 WL 1905454, at *22, 32. Dr. Pamela Auble, appearing for Mr. Cribbs, stated in her initial report that his I.Q. was between 71 and 84. *Cribbs v. State*, 2009 WL 1905454, at *17. However, Dr. Auble later revised her opinion based on information obtained after her first report and concluded that Mr. Cribbs's I.Q. was below seventy. *Cribbs v. State*, 2009 WL 1905454, at *17. Based on all the evidence, the trial court concluded that the I.Q. test that produced the score of 73 was the most reliable. The trial court found that Dr. Auble's explanation for the change in her opinion was not credible and that Dr. Nichols's testimony was persuasive. *Cribbs v. State*, 2009 WL 1905454, at *32.

The consideration of I.Q. test scores in *Cribbs v. State* is but one example of cases in which the State has argued and presented evidence that scores on I.Q. tests should not be considered on their face value. *See also State v. Strode*, 233 S.W.3d at 5 (the State presented evidence challenging the score on the basis that the defendant had been malingering); *Smith v. State*, 2010 WL 3638033, at *30 (the State presented evidence that the defendant's I.Q. test score should be discounted because of malingering); *Van Tran v. State*, 2006 WL 3327828, at 4-6 (the State argued that the Vietnamese-born defendant's low I.Q. test score reflected cultural and linguistic bias).

These cases reflect the parties' and the courts' existing awareness that, as a practical matter, a criminal defendant's "functional intelligence quotient" cannot be ascertained based only on raw I.Q. test scores. More importantly, they also reflect the parties' conclusion that Tenn. Code Ann. § 39-13-203(a) does not prevent them from presenting relevant and competent evidence, other than the defendant's raw I.Q. test scores, either to prove or to disprove that the defendant's "functional intelligence quotient" when the crime was committed was "seventy (70) or below." Our decision today confirms that this conclusion was entirely correct.

**IV.**

In order to prove intellectual disability for the purpose of Tenn. Code Ann. § 39-13-203(a), a person must also demonstrate that he or she has "[d]eficits in adaptive behavior." Tenn. Code Ann. § 39-13-203(a)(2). Both the post-conviction trial court and the Court of Criminal Appeals found that Mr. Coleman failed to demonstrate that he had deficits in adaptive behavior. Accordingly, we must determine whether Mr. Coleman proved by a preponderance of the evidence that he has deficits in adaptive behavior. Tenn. Code Ann. § 39-13-203(c).

The General Assembly has not defined what it means by "[d]eficits in adaptive behavior" in Tenn. Code Ann. § 39-13-203(a)(2). While this Court has not adopted the clinical definition of the phrase, *State v. Smith*, 893 S.W.2d at 917, we have stated that deficits in adaptive behavior "mean[s] the inability of an individual to behave so as to adapt to the surrounding circumstances." *State v. Smith*, 893 S.W.2d at 918. Notwithstanding *State v. Smith*, Tennessee's trial and appellate courts have repeatedly relied upon expert analysis of adaptive behavior or functioning predicated upon definitions advanced within the relevant medical and psychological community and authoritative texts such as the AAIDD Manual and the DSM-IV in determining whether the second prong has been satisfied. *See*, *e.g.*, *State v. Strode*, 232 S.W.3d at 4-6, 17-18; *Howell v. State*, 151 S.W.3d at 454-55 n.2; *Van Tran v. State*, 2006 WL 3327828, at *2, *7, *10-11, *16.

In the present case, the trial court and the Court of Criminal Appeals turned to the definition of adaptive functioning referenced by this Court in *Van Tran v. State*, 66 S.W.3d at 795. Therein, we drew upon the DSM-IV, stating that

> adaptive functioning [] "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting." [A] mentally retarded person will have significant limitations in at least two of the following basic skills: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Influences on adaptive functioning may include the individual's "education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation."

*Van Tran v. State*, 66 S.W.3d at 795 (citations omitted) (quoting DSM-IV at 39-40).[86]

In its efforts to apply this understanding of deficits in adaptive behavior, the trial court found that Mr. Coleman had demonstrated deficits in academic performance but concluded that deficits in this one area were not sufficient to demonstrate "[d]eficits in adaptive behavior" for purposes of Tenn. Code Ann. § 39-13-203(a)(2). The Court of Criminal Appeals concurred, finding that although Mr. Coleman "has established that he has deficits in academic performance, he has not established that he suffers substantial limitations in at least two adaptive behavioral skill areas. Accordingly, he has failed to establish that he has adaptive deficits by a preponderance of the evidence." *Coleman v. State*, 2010 WL 118696, at *29.

As noted above, the DSM-IV requires deficits in adaptive behavior in two skill areas to support a diagnosis of intellectual disability.[87] Both the trial court and the Court of Criminal Appeals noted deficiencies in other areas, particularly social and interpersonal skills, but attributed the cause of these deficiencies to sources other than intellectual limitations, including Mr. Coleman's history of mental illness.

There are two critical shortcomings in the post-conviction trial court's and the Court of Criminal Appeals' analysis of this issue. First, as we have previously noted in Section III, *Howell v. State* does not bar the expert testimony of Drs. Baumeister and Woods. Accordingly, the post-conviction trial court and the Court of Criminal Appeals erred by categorically excluding this testimony based on *Howell v. State*. Both the trial court and the Court of Criminal Appeals weighed the relative strength of the causes of Mr. Coleman's seeming deficiencies in adaptive behavior without considering Drs. Baumeister and Woods' testimony indicating that Mr. Coleman's intellectual capacities rendered him intellectually disabled.

---

[86]Citing our prior decision in *State v. Smith* in which we declined to adopt the 1983 AAMR Manual's definition of "adaptive behavior," we expressly noted in *Van Tran v. State* that

> [t]he DSM IV is the treatise referred to and relied upon in the mental health field for the discussion and diagnosis of mental disorders. We refer to it for the purpose of providing insight and background into mental retardation and not for the purpose of expanding upon or interpreting the statutory definition in Tennessee.

*Van Tran v. State*, 66 S.W.3d at 795 n.4. Tennessee courts have thus relied on this definition to better understand what the Tennessee Code means by addressing deficits in adaptive behavior. *See*, *e.g.*, *Van Tran v. State*, 2006 WL 3327828, at *21-23.

[87]The DSM-IV-TR contains the same requirements as the DSM-IV. DSM-IV-TR, at 49.

We cannot conclude beyond a reasonable doubt that the erroneous exclusion of this evidence did not have a substantial and injurious impact on the trial court and the Court of Criminal Appeals' decision-making in weighing the relative strengths of the causes of the seeming deficits in Mr. Coleman's adaptive behavior. *See State v. Ingram*, ___ S.W.3d ___, ___, 2011 WL 197870, at *11 (Tenn. 2011). Therefore, we cannot find this error to be harmless. *See State v. Rodriguez*, 254 S.W.3d 361, 371-72 (Tenn. 2008).

The second shortcoming in the lower courts' analysis of Mr. Coleman's evidence involves their decision to distinguish between Mr. Coleman's mental illness and his intellectual disability as separate causes of his adaptive limitations. By concluding that Mr. Coleman's adaptive deficiencies were caused by his mental illness alone, the lower courts treated Mr. Coleman's mental illness and intellectual disabilities as separate dichotomous spheres rather than as interwoven causes.

Distinguishing causally between intellectual disability and mental illness raises broad conceptual concerns in terms of the application of Tenn. Code Ann. § 39-13-203(a)(2). Causation and adaptive deficits present a complicated intersection. The American Psychiatric Association's, *Diagnostic and Statistical Manual of Mental Disorders* notes that "[a]daptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with [m]ental [r]etardation." DSM-IV-TR, at 42.

Justice Reid observed in his dissenting opinion in *State v. Smith* that "it should be noted that the statute [Tenn. Code Ann. § 39-13-203(a)(2)] requires only a finding of deficits in adaptive behavior; it does not matter what caused the deficits – whether low IQ, parental neglect, or an inadequate social environment." *State v. Smith*, 893 S.W.2d at 929. The majority did not engage the dissent on this point, nor has this Court in any subsequent decision expressly addressed this issue. In subsequent cases, this Court has neither affirmed nor reversed any finding as to deficits in adaptive behavior as a result of the causation of the adaptive deficit. In other words, this Court has not reached any holding on the issue of the role of causation with regard to assessing deficits in adaptive behavior.

Nor do courts have a universal approach to addressing this issue. For example, the Oklahoma Court of Criminal Appeals[88] has ruled that "[a] defendant must show he has significant limitations in adaptive functioning, but is not required to show that mental retardation is the cause of his limitations in these skill areas." *Lambert v. State*, 126 P.3d 646, 651 (Okla. Crim. App. 2005); *see also Of* Atkins *and Men*, 18 Cornell J.L. & Pub. Pol'y at 728 (stating that "[t]he test is between the individual and their environment: if the

---

[88]The Oklahoma Court of Criminal Appeals is Oklahoma's court of last resort in criminal matters.

individual functions at a significantly deficient level in certain skills, they have mental retardation, regardless of the etiology of their limitations"). Alternatively, the Texas Court of Criminal Appeals[89] requires a defendant to prove that deficits in adaptive behavior are "related to" construed as meaning caused by or connected with the defendant's intellectual limitations. *Ex parte Blue*, 230 S.W.3d 151, 164 (Tex. Crim. App. 2007).

Providing a useful background discussion of this issue, Drs. Gilbert S. MacVaugh and Mark D. Cunningham addressed the question of the role of causation in assessing adaptive deficits in the *Journal of Psychiatry and Law*:

> A frequently debated issue related to the assessment of adaptive functioning in *Atkins* cases pertains to whether or not observed deficits in adaptive behavior are directly attributable to significantly subaverage intellectual functioning. None of the definitions of mental retardation explicitly addresses whether or not there is a direct causal relationship between these two prongs of the definition . . . when describing the relationship between intellectual and adaptive impairments. It is not uncommon . . . for experts to disagree about the cause of apparent deficits in certain domains of adaptive behavior . . . .
>
> [Professor George S.] Baroff described this issue as "one of the ambiguities" of the 1983 AAMR definition of mental retardation. Unfortunately, this ambiguity continues to exist in current definitions of mental retardation. Although pre-*Atkins*, [Professor] Baroff further observed that, at the time, available definitions of mental retardation did
>
>> not address the seemingly crucial question of whether adaptive behavior impairments are directly attributable to intellectual functioning . . . or are merely associated with it. . . . We are left to choose, and, for me, unless the behavior appears to a direct reflection of intellectual impairment, to use it as a basis for a diagnosis of mental retardation seems illogical.[90]

---

[89]The Texas Court of Criminal Appeals is Texas's court of last resort in criminal matters.

[90]George S. Baroff, *Establishing Mental Retardation in Capital Cases: A Potential Matter of Life and Death*, 29 Mental Retardation 343, 348 (1991).

Based on the current definitions of mental retardation, the ambiguities regarding the cause of adaptive behavior deficits continues to present a problem in the post-*Atkins* era. Some commentators have argued that the cause of adaptive impairments is irrelevant. For example, [Professor J. Gregory] Olley has asserted:

> Many arguments in court appear to be based on the assumption that diagnostic categories are explanatory concepts or causal factors. The discussion is sometimes framed as, 'Was the observed adaptive behavior deficit caused by mental retardation or something else?' The reply is that mental retardation is not a cause at all, but a result. Mental retardation is a label given to a constellation of observed behaviors. It doesn't cause anything, but any one of several hundreds of known factors (genetics, environmental, infection, trauma, etc.) can cause the condition that we call mental retardation. Although the cause of mental retardation is often not known, it is clear that mental retardation is a term for the result; it is not a cause. To reason otherwise would be to argue that mental retardation causes mental retardation.[91]

Although the reasoning proposed by [Professor] Olley[92] has merit, to say that . . . adaptive impairments do not have to be due to intellectual impairments is problematic. In our view, the task of determining the cause(s) of what may be adaptive deficit is different than attempting to determine the cause of mental retardation. Some behaviors or patterns of behavior could be related to intellectual difficulties, personality traits, both, or a combination of those and other factors. For example, a person might drop out of school after repeated failure to succeed no

---

[91] J. Gregory Olley, *The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 3: Sources of Adaptive Behavior*, 33 Psychology in Mental Retardation and Developmental Disabilities 3, 3-4 (2007).

[92] J. Gregory Olley, *The Assessment of Adaptive Behavior in Adult Forensic Cases: Part 2: The Importance of Adaptive Behavior*, 32 Psychology in Mental Retardation and Developmental Disabilities 7, 7-8 (2006).

matter how hard he tried. Or a person might drop out of school to pursue a criminal lifestyle. Both could be true for the same person.

Recognizing that deficits in adaptive functioning may arise from multiple sources, forensic clinicians in *Atkins* cases should neither assume that adaptive deficits are invariably related to intellectual impairment nor exclude intellectual impairment as an etiological factor in the presence of other contributing factors. We recommend that forensic clinicians consider and be prepared to explain the role of any intellectual impairment in the observed deficiency in adaptive functioning. Review of the trajectory of adaptive deficits over time may inform this differential.

Gilbert S. MacVaugh & Mark D. Cunningham, Atkins v. Virginia: *Implications and Recommendations for Forensic Practice*, 37 J. Psychiatry & L. 131, 169-71 (2009) (footnotes added) (citations omitted).

For the purposes of this opinion, we need not decide which of the approaches discussed by Drs. MacVaugh and Cunningham provides the best means of assessing whether a defendant has demonstrated "[d]eficits in adaptive behavior" for purposes of Tenn. Code Ann. § 39-13-203(a)(2).[93] Regardless of which approach is the most appropriate, distinguishing causally between intellectual disability and mental illness in the present case was error in light of the evidence presented by Drs. Baumeister and Woods.

The American Psychiatric Association has pointed out that "[m]ental [r]etardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." DSM-IV-TR, at 41. Drs. Baumeister and Woods indicated that "mental retardation is almost always accompanied by other serious co-morbid features (such as mental disorders)." They specifically noted the "complex relationship between mental retardation and mental illnesses, which . . . can be the cause of . . . [or] associated with and compound the effects of mental retardation."

Assessing Mr. Coleman, Drs. Baumeister and Woods indicated that Mr. Coleman's circumstances involved a "complex relationship between mental retardation and mental health." They concluded that, along with organic brain disorder and environmental factors,

---

[93]Addressing this question will be more appropriate in a case in which the parties have joined issue on the question and thus have created a well-developed record.

mental illness provided an aggravating factor joining together to limit Mr. Coleman's adaptive functioning. Drs. Baumeister and Woods stated that

> mental illness and organic brain disorders can be causes of mental retardation, and they are also often disabilities associated with mental retardation. Given there is no standard clinical typology of mental retardation, and given the myriad clinical features of mental retardation resulting from its numerous and heterogeneous (differing) etiologies (causes), distinguishing between disabilities that are causal agents, on the one hand, and those that are simply associated with mental retardation, on the other, is often impossible.

Dr. Baumeister testified that mental illness and intellectual disability have a co-morbidity and are often linked by a single causal factor, for example a brain infection or specific genetic abnormality, that manifests itself in multiple ways.

Drs. Baumeister and Woods concluded that Mr. Coleman's intellectual disability and mental illness were inter-related and served to aggravate each other, combining to limit Mr. Coleman's adaptive functionality. The State presented no contrary evidence. There is simply no sufficient basis on the present record to separate the impact of mental illness and intellectual disability in assessing Mr. Coleman's deficits in adaptive behavior. Based upon the evidence presented, Mr. Coleman's intellectual disability and mental illness are simply too intertwined in cause and effect for such unraveling. Accordingly, based upon the evidence presented, the trial court and Court of Criminal Appeals erred in finding that, because mental illness could have caused Mr. Coleman's adaptive deficiencies, those adaptive deficits did not result from Mr. Coleman's intellectual disability.

We cannot conclude beyond a reasonable doubt that the lower courts' erroneous causation analysis did not have a substantial and injurious impact on their determination that Mr. Coleman failed to carry his burden of establishing deficits in adaptive behavior. *See State v. Ingram*, ___ S.W.3d ___, ___, 2011 WL 197870, at \*11. Therefore, we cannot find this error to be harmless. *See State v. Rodriguez*, 254 S.W.3d at 371-72.

Accordingly, we vacate the decisions of both the Court of Criminal Appeals and the post-conviction trial court that Mr. Coleman failed to demonstrate by a preponderance of the evidence that he met the requirements of Tenn. Code Ann. § 39-13-203(a)(2) and remand the case for further proceedings consistent with this opinion. On remand, the State may challenge the admissibility of Drs. Baumeister and Woods' testimony, present expert testimony countering Drs. Baumeister and Woods' methods or conclusions on this issue, or do both.

## V.

As a final matter, Mr. Coleman contends that he has not had an opportunity for a full and fair hearing on his ineffective assistance of counsel claim because he did not have a statutory right to investigative and expert resources when he was required to present his ineffective assistance of counsel claim and to prove prejudice. He insists that this Court's decision in *Howell v. State* recognizes his due process right to seek those resources and to present his ineffective assistance of counsel claim. In Mr. Coleman's view, this Court has a "supervisory power" to allow him to raise this issue.

The State takes a dim view of Mr. Coleman's argument that he may have his ineffective assistance of counsel claim considered on the merits. Noting that this issue has been previously determined adversely to Mr. Coleman, the State points out that Mr. Coleman raised the issue of ineffective assistance of counsel in his first and second petitions for post-conviction relief and that he specifically raised the issue of having a new right to expert and investigative services in his second petition for post-conviction relief. The State contends that "[a]lthough couched in terms of the Court's supervisory authority, [Mr.] Coleman's invitation is one to re-write the Post-Conviction Procedures Act to allow an endless presentation of successive claims."

## A.

Mr. Coleman filed his first petition for post-conviction relief on March 10, 1982. The post-conviction trial court conducted an evidentiary hearing on February 18, 1983. On March 15, 1983, the trial court dismissed Mr. Coleman's petition.

On April 12, 1983, Mr. Coleman appealed the dismissal of his post-conviction petition to the Tennessee Court of Criminal Appeals. On appeal, Mr. Coleman raised sixteen issues including an ineffective assistance of counsel claim with ten sub-arguments. Nine of the sub-arguments related to failure to object and one related to failure to develop mitigation evidence through his examination of Dr. John Hutson at the sentencing hearing.

In its June 28, 1984 opinion, the Court of Criminal Appeals rejected Mr. Coleman's arguments and affirmed the trial court's dismissal of Mr. Coleman's petition for post-conviction relief. *State v. Coleman*, 1984 Tenn. Crim. App. LEXIS 2883, at *35-36. Addressing Mr. Coleman's ineffective assistance of counsel claim, the Court of Criminal Appeals ruled that "[w]e are not persuaded that trial counsel was ineffective. To the contrary, the record demonstrates that the appellant was well represented by Attorney A.J. Archibald." *State v. Coleman*, 1984 Tenn. Crim. App. LEXIS 2883, at *32.

The Court of Criminal Appeals noted its "agree[ment] with the findings of the post-conviction court, that the defense conducted by [Mr. Coleman's] trial counsel more than met the requirements for competence." *State v. Coleman*, 1984 Tenn. Crim. App. LEXIS 2883, at *33. Additionally, the court determined that "[t]he unfavorable verdict applicable to the appellant is not attributable to any ineptness or ineffectiveness of counsel, but is attributed to the evidence of the appellant's criminal conduct as properly weighed by the court and jury." *State v. Coleman*, 1984 Tenn. Crim. App. LEXIS 2883, at *34.

Mr. Coleman sought permission to appeal this decision to this Court. On October 29, 1984, we denied Mr. Coleman's application for permission to appeal. Later, on February 25, 1985, the United States Supreme Court denied Mr. Coleman's petition for writ of certiorari.

In May 1993, Mr. Coleman filed a second petition for post-conviction relief. On this occasion, he argued for the first time that he had ineffective assistance of counsel as a result of his trial counsel's failure to investigate and to present mitigating evidence. The State responded that this claim was procedurally barred. On March 7, 1996, the post-conviction trial court found that the claim was procedurally barred and dismissed the petition.

Mr. Coleman appealed to the Court of Criminal Appeals. In its December 4, 1998 opinion, the court affirmed the dismissal of Mr. Coleman's second petition for post-conviction relief. *Coleman v. State*, 3 S.W.3d at 25. With regard to trial counsel's failure to investigate mitigation, the Court of Criminal Appeals noted that this argument could have been, but was not, raised in Mr. Coleman's first petition for post-conviction relief and accordingly was waived. *Coleman v. State*, 3 S.W.3d at 24. The court reached the same conclusion regarding the trial court's alleged errors in denying a motion for investigative resources and excluding certain evidence. *Coleman v. State*, 3 S.W.3d at 24.

Noting the Court of Criminal Appeals' finding in 1984 that Mr. Coleman's trial counsel was not ineffective, the Court of Criminal Appeals also concluded that a claim of ineffective assistance of counsel was barred procedurally as having been "previously determined." *Coleman v. State*, 3 S.W.3d at 24. In addition to procedural bars that arose from waiver and presenting an issue that was previously determined, the Court of Criminal Appeals also found that Mr. Coleman's claims of ineffective assistance of counsel were barred by the statute of limitations. *Coleman v. State*, 3 S.W.3d at 24.

Addressing the seeming untimeliness of his claims, Mr. Coleman had argued to the Court of Criminal Appeals that it was only after this Court's decision in *Owens v. State*, 908 S.W.2d 923 (Tenn. 1995) recognizing a right to investigative and expert assistance in post-conviction proceedings that he could access resources to support his claim. The Court of Criminal Appeals noted that *Owens v. State* involved a statutory and not a constitutional right. *Coleman v. State*, 3 S.W.3d at 25. Accordingly, the decision did not provide a basis

for granting an exception to the procedural barriers barring consideration of his post-conviction claim. *Coleman v. State*, 3 S.W.3d at 25. On May 10, 1999, this Court declined to review the Court of Criminal Appeals' decision, and, on October 12, 1999, the United States Supreme Court denied Mr. Coleman's petition for a writ of certiorari.

On December 3, 2002, Mr. Coleman filed a motion to re-open his earlier post-conviction petition. He again raised the ineffective assistance of counsel claims that he had raised in his second post-conviction petition. In an amended motion filed on January 21, 2005, Mr. Coleman argued that this Court's 2004 decision in *Howell v. State* announced a new constitutional due process rule that justifies hearing his ineffective assistance of counsel claim.

The post-conviction trial court filed an order on November 9, 2007, rejecting Mr. Coleman's argument based on *Howell v. State* and finding that Mr. Coleman was procedurally barred from advancing his ineffective assistance of counsel claim. The trial court explained:

> This court finds both the effectiveness of petitioner's counsel and the issue of whether petitioner should be afforded an opportunity to develop these claims through expert assistance have been previously litigated by petitioner and a court of competent jurisdiction has ruled that counsel was effective in their representation and petitioner is not retroactively entitled to expert and investigative services for the purpose of developing claims of ineffective assistance of counsel.

Mr. Coleman renewed his arguments before the Court of Criminal Appeals. However, in its January 13, 2010 opinion, the Court of Criminal Appeals found that Mr. Coleman's reliance on *Howell v. State* was misplaced and that the ineffective assistance of counsel issues that he now sought to raise could have been raised in the earlier post-conviction proceedings. *Coleman v. State,* 2010 WL 118696, at * 31. Accordingly, the Court of Criminal Appeals affirmed the dismissal of Mr. Coleman's motion to open his post-conviction petition.

Before this Court, Mr. Coleman argues that *Howell v. State* announced a new due process rule that requires consideration of his ineffective assistance of counsel claim on the merits rather than finding it to be procedurally barred. He also argues that he has not had an opportunity to present this claim. The State responds that Mr. Coleman's ineffective assistance of counsel claims are procedurally barred.

**B.**

Mr. Coleman's arguments regarding the effectiveness of his original trial counsel with regard to assembling and presenting mitigating evidence at his 1980 trial are compellingly articulated and not without substantive support. They are, however, now beyond our reach because of well-recognized limitations in the Tennessee Post-Conviction Procedure Act.[94] We will discuss three of these limitations – the statute of limitations, the restrictions on re-opening petitions for post-conviction relief once they have been ruled on, and the prohibition against re-litigating issues that have been previously determined. We have also determined that Mr. Coleman's reliance on *Howell v. State* is misplaced.

With regard to the time when petitions for post-conviction relief must be filed, Tenn. Code Ann. § 40-30-102(a) states that

> [e]xcept as provided in subsections (b) and (c), a person in custody under a sentence of a court of this state must petition for post-conviction relief under this part within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of the petition shall be barred. The statute of limitations shall not be tolled for any reason, including any tolling or saving provision otherwise available at law or equity. Time is of the essence of the right to file a petition for post-conviction relief or motion to reopen established by this chapter, and the one-year limitations period is an element of the right to file the action and is a condition upon its exercise. Except as specifically provided in subsections (b) and (c), the right to file a petition for post-conviction relief or a motion to reopen under this chapter shall be extinguished upon the expiration of the limitations period.

Tenn. Code Ann. § 40-30-102(c) also states that the Act "contemplates the filing of only one (1) petition for post-conviction relief," allowing a petition that has been resolved to be re-opened only under the limited circumstances specified in Tenn. Code Ann. § 40-30-117. To avoid dismissal, a claim for relief also must not have been previously determined. Tenn. Code Ann. § 40-30-106(f), (h).

---

[94]The Tennessee Post-Conviction Procedure Act is currently codified at Tenn. Code Ann. §§ 40-30-101 to -122 (2006 & Supp. 2010).

The statute of limitations expired on Mr. Coleman's ineffective assistance of counsel claim based on the failure to investigate his mitigation case claim in 1989.[95] Accordingly, for the statute of limitations not to act as a bar upon consideration of this claim, Mr. Coleman's argument for relief must satisfy one of the exceptions enumerated in Tenn. Code Ann. 40-30-102(b). These exceptions correspond to the circumstances in Tenn. Code Ann. § 40-30-117(a) (1) - (3) that authorize re-opening a previously resolved petition – another procedural hurdle that Mr. Coleman must surmount.

These exceptions include the following:

(1) The claim in the petition is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The petition must be filed within one (1) year of the ruling of the highest state appellate court or the United States supreme court establishing a constitutional right that was not recognized as existing at the time of trial;

(2) The claim in the petition is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or

(3) The claim asserted in the petition seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid, in which case the petition must be filed within one (1) year of the finality of the ruling holding the previous conviction to be invalid.

---

[95]When this Court denied Mr. Coleman's direct appeal on July 27, 1981, there was no statute of limitations on post-conviction petitions. *See State v. Prince*, 781 S.W.2d 846, 851-52 (Tenn. 1989). In 1986, the General Assembly imposed a three-year statute of limitations on post-conviction petitions effective July 1, 1986. Act of Mar. 3, 1986, ch. 634, §§ 1-2, 1986 Tenn. Pub. Acts 348, 348. The General Assembly in 1995 reduced the statute of limitations for petitions for post-conviction relief to one year. Act of Apr. 26, 1995, ch. 207, § 1, 1995 Tenn. Pub. Acts 305, 305. The later modification did not afford a new one-year period for filing for time-barred claims; rather, such claims became and remained effectively barred by the statute of limitations as of June 30, 1989. *See Sample v. State*, 82 S.W.3d 267, 271-72 (Tenn. 2002); *Carter v. State*, 952 S.W.2d 417, 418 (Tenn. 1997); *Potts v. State*, 833 S.W.2d 60, 61 (Tenn. 1992).

Tenn. Code Ann. §§ 40-30-102(b), -117(a)(1)-(3).

Mr. Coleman asserts that his right to a new hearing on his ineffective assistance of counsel claim has a constitutional basis, arising from a new due process right recognized by this Court in *Howell v. State*. He characterizes *Howell v. State* as ensuring "a right to a meaningful hearing on issues that may not be denied or impaired based upon the arbitrary application of procedural rules or upon the accident of when the defendant is *able* to raise or present such a claim for the first time."

We concluded in *Howell v. State* that "[b]ecause the petitioner was not able to previously advance his claim of mental retardation as a challenge to his eligibility . . . [for] the death penalty . . . he should be held to the lower 'colorable claim' standard instead of requiring him to plead facts to show his mental retardation by 'clear and convincing evidence.'" *Howell v. State*, 151 S.W.3d at 463. While that aspect of *Howell v. State* was novel, it has been nearly two decades since this Court expressly incorporated the foundations upon which *Howell v. State* reached this conclusion – the opportunity to be heard at a meaningful time and in a meaningful manner – into its analysis of due process restraints upon the application of the statute of limitations in post-conviction proceedings. *See Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992). Our decision in *Howell v. State* reflected well-established procedural due process principles requiring that defendants be afforded a fair and reasonable opportunity to assert their claims. *See*, e.g., *Williams v. State*, 44 S.W.3d 464, 468-69 (Tenn. 2001); *Seals v. State*, 23 S.W.3d 272, 277-79 (Tenn. 2000); *Watkins v. State*, 903 S.W.2d 302, 307 (Tenn. 1995). This Court expressly made the point in *Howell v. State* that it was walking upon a well-worn path:

> As in *Burford*, *Williams*, and *Seals*, the petitioner in this case has been confronted with circumstances beyond his control which prevented him from previously challenging his conviction and sentence on constitutional grounds. For these reasons, we find the petitioner's individual interests to outweigh those of the state under the specific facts of this capital case.

*Howell v. State*, 151 S.W.3d at 462.

Accordingly, *Howell v. State* did not establish a new constitutional right empowering Mr. Coleman to re-raise his ineffective assistance of counsel claim. Therefore, Mr. Coleman's current ineffective assistance of counsel claim neither satisfies the requirements for an exception to the statute of limitations bar nor provides a basis for re-opening a ruled upon petition for post-conviction relief. Tenn. Code Ann. § 40-30-102(b); Tenn. Code Ann. § 40-30-117(a).

Mr. Coleman's argument also runs squarely into the bar against raising previously determined issues in Tenn. Code Ann. § 40-30-106(f), (h). Mr. Coleman was afforded an evidentiary hearing in 1983 on his first petition for post-conviction relief. On that occasion, the trial court rejected Mr. Coleman's claim of ineffective assistance of counsel. On appeal, the Court of Criminal Appeals concluded not only that Mr. Coleman had not received ineffective assistance of counsel but that he had actually been "well represented." *State v. Coleman*, 1984 Tenn. Crim. App. LEXIS 2883, at *32.

In its 1998 opinion addressing Mr. Coleman's second petition for post-conviction relief, the Court of Criminal Appeals concluded that Mr. Coleman's ineffective assistance claim based upon failure to investigate had been waived because it had not been raised in his first post-conviction petition. *Coleman v. State*, 3 S.W.3d at 24.[96] The Court of Criminal Appeals also found that the issue of ineffective assistance of counsel had been previously determined in a 1984 decision and was thus procedurally barred. *Coleman v. State*, 3 S.W.3d at 24.

For the reasons discussed above, Mr. Coleman does not satisfy the exceptions to the statute of limitations or the exceptions for re-opening a previously resolved petition for post-conviction relief. Not only have Mr. Coleman's ineffective assistance of counsel claims been previously determined, the Court of Criminal Appeals has previously determined in 1998 that Mr. Coleman is procedurally barred from raising these claims. Simply stated, Mr. Coleman's claim of ineffective assistance of counsel is procedurally barred under the Post-Conviction Act.[97]

_____

[96] *See generally* Tenn. Code Ann. § 40-30-106(f) - (g) (providing that waiver constitutes a basis for dismissing a post-conviction petition).

[97] Mr. Coleman has repeatedly insisted that he did not have an opportunity to raise his ineffective assistance of counsel claim in his first post-conviction petition due to a lack of resources for investigative services available for post-conviction defendants in Tennessee until this Court's 1995 decision in *Owens v. State*. This statement, while emphasized through repetition by Mr. Coleman, is incorrect. Mr. Coleman could have advanced a failure to investigate his mitigation case in his post-conviction petition even without expert assistance. The Tenn. Sup. Ct. R. 12 report following his conviction and sentencing contained information indicating that Mr. Coleman had not made it past the eighth grade, had a "low intelligence level" with an I.Q. of 70 or below, character or behavior disorders, noted that Mr. Coleman was hospitalized in the psychiatric unit of City of Memphis Hospital due to auditory and visual hallucinations, and that a 1972 psychological evaluation had concluded that Michael Coleman had "difficulty in accurately comprehending and assessing situations." Accordingly, even before beginning conversations with Mr. Coleman about his upbringing and experiences, and long before accessing expert assistance, Mr. Coleman had a strong basis of an ineffective assistance of counsel for failure to investigate claim in failing to investigate and present such testimony in mitigation. Mr. Coleman could have but did not present this claim in his first petition for post-conviction relief. Lack of expert resources did not render him unable to do so. In 1998, the Court of Criminal Appeals concluded that Mr. Coleman's ineffective assistance for failure to investigate argument
(continued...)

## VI.

We remand for further proceedings consistent with this decision. On remand, Mr. Coleman and the State are free to present additional evidence regarding whether Mr. Coleman meets the definition of intellectual disability under Tenn. Code Ann. § 39-13-203(a). The admissibility of any expert testimony is, however, subject to Tenn. R. Evid. 702 and Tenn. R. Evid. 703. It appearing that defendant Michael Coleman is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE

---

[97](...continued)
was waived because it could have been raised in his first petition for post-conviction relief but was not. *Coleman v. State*, 3 S.W.3d at 24. That decision was not in error.