FILED
11/18/2022
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 24, 2022 Session Heard at Nashville[1]

**STATE OF TENNESSEE v. TYSHON BOOKER**

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Knox County
No. 108568   G. Scott Green, Judge**

_____

**No. E2018-01439-SC-R11-CD**

_____

HOLLY KIRBY, J., concurring in the judgment.

Not so long ago, it was commonplace for states to require juveniles convicted of homicide to serve sentences of over fifty years.  Now, that practice has vanished.  A review of sentencing statutes enacted by state legislatures and court decisions shows that there is now only one state where juvenile offenders face a mandatory non-aggregated sentence of more than 50 years for first-degree murder with no aggravating factors—Tennessee.  In the entirety of the nation, Tennessee stands alone.

This is strong objective evidence that a national consensus has formed *against* juvenile sentencing statutes like Tennessee's.  My concurrence in the holding in Justice Lee's plurality opinion is based on this unequivocal objective data.  In the absence of solid objective indicia, I would not be able to concur in the plurality's judgment in favor of Mr. Booker.

In this case, the Court granted permission to appeal on the question of whether a mandatory sentence of life imprisonment for juvenile offenders for first-degree murder, with no aggravating factors, under Tennessee Code Annotated sections 39-13-208(c) and 40-35-501(h)(2) violates the provisions in the United States and Tennessee Constitutions forbidding cruel and unusual punishment. In Tennessee, the mandatory sentence of life imprisonment is a term sentence of sixty years, with a minimum service of fifty-one years.

---

[1] We first heard oral argument on February 24, 2021.  In light of the untimely death of Justice Cornelia A. Clark and by order of this Court filed December 17, 2021, retired Tennessee Supreme Court Justice William C. Koch, Jr., was designated to participate in this appeal.  The case was re-argued on February 24, 2022.

*See Brown v. Jordan*, 563 S.W.3d 196, 202 (Tenn. 2018).[2]  I concur in the holding in the plurality opinion that Tennessee Code Annotated section 40-35-501(h)(2), when imposed on a juvenile homicide offender, violates the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution.  I also concur in the remedy adopted in the plurality opinion and agree it is limited to offenders who were juveniles at the time of the offense.  Accordingly, I concur in the judgment in the plurality opinion.  I write separately to explain the importance of objective indicia of national consensus to the Eighth Amendment analysis in this case.

## I.  EIGHTH AMENDMENT ANALYSIS

The Eighth Amendment "bars not only those punishments that are 'barbaric' but also those that are 'excessive' in relation to the crime committed." *Coker v. Georgia*, 433 U.S. 584, 592 (1977).  The United States Supreme Court's decision in *Gregg v. Georgia* requires us to consider whether a particular punishment is "disproportionate in relation to the crime for which it is imposed." 428 U.S. 153, 187 (1976).  In doing so, *Gregg* described the substantive, but limited, responsibility imposed on the judiciary under the Eighth Amendment:

> Of course, the requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by the courts. This does not mean that judges have no role to play, for the Eighth Amendment is a restraint upon the exercise of legislative power.
> . . . .
> [W]hile we have an obligation to [e]nsure that constitutional bounds are not overreached, we may not act as judges as we might as legislators.

*Id.* at 174–75.  The legislature has the "power to define crimes and fix their punishment, unless that power encounters in its exercise a constitutional prohibition.  In such [a] case, not our discretion, but our legal duty, strictly defined and imperative in its direction, is invoked." *Weems v. United States*, 217 U.S. 349, 378 (1910).

In this case, Mr. Booker was convicted of a most serious offense, first-degree murder.  "[W]hen a life has been taken deliberately by the offender," that is considered

---

[2] Tennessee Code Annotated § 39-13-208(c) provides that, when the State does not seek the death penalty or life without the possibility of parole, a defendant convicted of murder in the first degree "shall be sentenced to imprisonment for life."  Tennessee Code Annotated § 40-35-501(h)(2) provides that such a defendant "shall serve one hundred percent (100%) of sixty (60) years less sentence credits earned and retained," but "no sentence reduction credits . . . shall operate to reduce the sentence imposed by the court by more than fifteen percent (15%)."  In *Brown*, the Court interpreted these provisions to mean that "[a] defendant convicted of first-degree murder that occurred on or after July 1, 1995, may be released after service of at least fifty-one years if the defendant earns the maximum allowable sentence reduction credits." 563 S.W.3d at 202.

"the most extreme of crimes." *Gregg*, 428 U.S. at 187. The length of Mr. Booker's sentence, in and of itself, is not inherently grossly disproportionate to either the crime or the offender, and does not offend the Eighth Amendment. Indeed, in *Miller v. Alabama*, the U.S. Supreme Court expressly permitted sentencers to impose life-without-parole sentences on juvenile homicide offenders, so long as the sentence was not mandatory, that is, so long as there was discretion to consider the defendant's youth and impose a lesser punishment. *See* 567 U.S. 460, 479–80 (2012). And life without parole is an even more severe sentence than Mr. Booker received.

In this type of Eighth Amendment case, where the punishment is not barbaric and not inherently disproportionate to either the crime or the offender, objective indicia of national consensus is a threshold issue. That is, without objective indicia of national consensus against the punishment contained in the statute at issue, the analysis would go no further. This is explained below.

### 1. As Applied to Juvenile Offenders

Here, Mr. Booker asserts that Tennessee's mandatory sentence of life imprisonment violates the Eighth Amendment to United States Constitution as applied to juvenile homicide offenders. As to a category of offenders, the Eighth Amendment does not guarantee there will be *no* risk of a disproportionate sentence in a specific case. The question instead is whether Tennessee's statutory framework creates an *unacceptably high* risk of a disproportionate sentence in a given case with a juvenile defendant. *See Jones v. Mississippi*, 141 S. Ct. 1307, 1317 (2021) ("[*Miller*] stated that a mandatory life-without-parole sentence for an offender under 18 'poses too great a risk of disproportionate punishment.'" (quoting *Miller*, 567 U.S. at 479)).

The question of whether the risk of a disproportionate sentence is so high that it offends the Constitution is assessed under the analysis set forth in the United States Supreme Court's Eighth Amendment jurisprudence on juvenile offenders. Justice Lee's plurality opinion describes in detail the Supreme Court's Eighth Amendment cases on juvenile offenders, demonstrating the Court's increasingly firm conviction that children are different when it comes to sentencing. *See Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) ("[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult."). The three general differences between juveniles and adults consistently cited by the Supreme Court are (1) "lack of maturity and an underdeveloped sense of responsibility," (2) "more vulnerab[ility] or susceptib[ility] to negative influences and outside pressures, including peer pressure," and (3) that "the character of a juvenile is not as well formed as that of an adult." *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005) (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)); *see also Graham v. Florida*, 560 U.S. 48, 86 (2010) (Roberts, C.J., concurring in the judgment) ("[J]uvenile offenders are generally less culpable than adults who commit the same crimes.").

-3-

In *Miller*, these three significant differences between juveniles and adults were the foundation for the Court's conclusion that "children are constitutionally different from adults for purposes of sentencing" and its holding that mandatory life-without-parole sentences for juveniles violated the Eighth Amendment. 567 U.S. at 471. More recent Eighth Amendment cases on juvenile offenders reaffirm these precepts. *See Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016) ("[C]hildren are constitutionally different from adults for purposes of sentencing." (quoting *Miller*, 567 U.S. at 471)); *see also Jones*, 141 S. Ct. at 1314 ("In a series of Eighth Amendment cases applying the Cruel and Unusual Punishments Clause, this Court has stated that youth matters in sentencing.").

This Supreme Court caselaw suggests that, in a case with a juvenile offender, the risk of a disproportionate sentence is higher than in a similar case with an adult offender. But that proposition does not automatically mean that juvenile defendants must *always* be sentenced under a separate, more lenient sentencing structure than adult offenders, in every case and for every crime. The question is whether, under a particular sentencing framework, the risk of a disproportionate sentence for a juvenile offender is so high that it violates the Eighth Amendment.

### 2. *Objective Indicia*

To answer the question of whether the risk of a disproportionate sentence for a juvenile offender under Tennessee sentencing statutes is unconstitutionally high, the Supreme Court's body of Eighth Amendment cases, taken as a whole, requires that we consult objective data. The proportionality assessment under the Eighth Amendment "does not call for a subjective judgment. It requires, rather, that we look to objective indicia that reflect the public attitude toward a given sanction." *Gregg*, 428 U.S. at 173. The Supreme Court has repeatedly emphasized "the requirement that proportionality review be guided by objective factors." *Ewing v. California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring in part and concurring in the judgment)).

The Supreme Court has looked to three kinds of objective indicia to determine whether there is a national consensus against a challenged sentencing practice. First is the number of states that have overtly rejected the challenged practice, either through legislative or judicial action. *See Atkins v. Virginia,* 536 U.S 304, 312 (2002) ("We have pinpointed that the clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." (quotation marks omitted) (citation omitted)); *Roper*, 543 U.S. at 564 ("By a similar calculation in this case, 30 States prohibit the juvenile death penalty, comprising 12 that have rejected the death penalty altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles from its reach.").

-4-

The next type of objective indicia is how frequently the challenged sentencing practice is actually used. *See Atkins*, 536 U.S. at 316 ("[E]ven in those States that allow the execution of [intellectually disabled] offenders, the practice is uncommon."); *Roper*, 543 U.S. at 564 ("[E]ven in the 20 States without a formal prohibition on executing juveniles, the practice is infrequent."); *Graham*, 560 U.S. at 62 ("Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use.").

The final type is objective indicia of trends among the states, including the direction and pace of change regarding the challenged sentencing practice. *See, e.g.*, *Atkins*, 536 U.S. at 315 ("It is not so much the number of these States that is significant, but the consistency of the direction of change."); *Roper*, 543 U.S. at 565–66 (discussing both consistency and pace of change compared to *Atkins*); *Graham*, 560 U.S. at 108–09 (Thomas, J., dissenting) (arguing that lack of consistency and direction of change counseled against the majority's decision).

Such objective indicia anchor any assessment of whether a statute violates the Eighth Amendment to data that demonstrates the nation's values and standards. This underpinning ensures principled constitutional analysis that is not premised on the subjective sensibilities of individual judges. *See Gregg*, 428 U.S. at 173.

To be sure, the Supreme Court's analysis in *Miller* relied much less than previous cases on this type of objective data. *See* 567 U.S. at 483 (distinguishing *Miller* "from the typical [case] in which we have tallied legislative enactments"). At the time *Miller* was decided, many states had the type of statute at issue in *Miller*, a mandatory sentence of life without parole for juveniles convicted of homicide. For that reason, the *Miller* majority's finding of an Eighth Amendment violation drew a sharp dissent from the Chief Justice.[3]

---

[3] Chief Justice Roberts first identified lack of objective indicia of national standards as the reason for his dissent: "The pertinent law here is the Eighth Amendment to the Constitution, which prohibits 'cruel and unusual punishments.' Today, the Court invokes that Amendment to ban a punishment that the Court does not itself characterize as unusual, and that could not plausibly be described as such. I therefore dissent." *Miller*, 567 U.S. at 493 (Roberts, C.J., dissenting). He then summarized the Court's Eighth Amendment cases on objective indicia:

> When determining whether a punishment is cruel and unusual, this Court typically begins with "objective indicia of society's standards, as expressed in legislative enactments and state practice." We look to these "objective indicia" to ensure that we are not simply following our own subjective values or beliefs. Such tangible evidence of societal standards enables us to determine whether there is a "consensus against" a given sentencing practice. If there is, the punishment may be regarded as "unusual."

*Id.* at 494 (first quoting *Graham*, 560 U.S. at 61; and then quoting *Gregg*, 428 U.S. at 173).

In a subsequent case, however, the Court's description of past Eighth Amendment caselaw on juvenile offenders reaffirmed its traditional emphasis on objective indicia. In *Jones v. Mississippi*, the Court considered whether *Miller* and *Montgomery* required sentencing authorities to make a separate factual finding that a juvenile offender was permanently incorrigible before sentencing him to life without parole. 141 S. Ct. at 1311. In considering whether permanent incorrigibility would be an eligibility criterion for a sentence, similar to sanity or competence, the *Jones* Court recounted that, "when the Court has established such an eligibility criterion, the Court has considered whether 'objective indicia of society's standards, as expressed in legislative enactments and state practice,' demonstrated a 'national consensus' in favor of the criterion." *Id.* at 1315 (quoting *Graham*, 560 U.S. at 61). Describing *Miller*'s discussion of whether a discretionary sentencing procedure would result in fewer life-without-parole sentences for juveniles, *Jones* commented: "Importantly, . . . the Court [in *Miller*] relied on data, not speculation. The Court pointed to statistics from 15 States that used discretionary sentencing regimes to show that, 'when given the choice, sentencers impose life without parole on children relatively rarely.'" *Id.* at 1318 (quoting *Miller*, 567 U.S. at 483 n.10).[4]

Thus, the body of Supreme Court Eighth Amendment cases counsel us to base any finding of unconstitutionality on solid data illuminating the nation's values and standards on the sentencing framework at issue, "objective indicia that reflect the public attitude toward a given sanction." *Gregg*, 428 U.S. at 173. Our review must be "guided by objective factors." *Ewing*, 538 U.S. at 23 (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in the judgment)). This approach provides a limiting principle to ensure that findings of a violation of the Eighth Amendment are reserved for punishments that may fairly be regarded as "unusual." *Miller*, 567 U.S. at 494 (Roberts, C.J., dissenting).

In this case, the elevated risk of a disproportionate sentence for a juvenile convicted of first-degree murder arises because of Tennessee's unique combination: (1) a mandatory sentence, allowing the sentencer no discretion, plus (2) a very lengthy minimum imprisonment of fifty-one years. Consistent with the facts in this case, it is appropriate to focus our review on how many states still subject juvenile offenders convicted of first-degree murder, with *no* aggravating factors, to a *mandatory* non-aggregated sentence of more than 50 years.

---

[4] *See also Jones*, 141 S. Ct. at 1320 ("*Miller* highlighted 15 existing discretionary state sentencing systems as examples of what was missing in the mandatory Alabama regime before the Court in that case." (citing *Miller*, 567 U.S. at 484 n.10)). Indeed, *Jones* itself used statistics to show that *Miller* and *Montgomery* had in fact accomplished the stated objective of drastically reducing the number of juvenile homicide offenders sentenced to life without parole. *See id.* at 1322 ("Those statistics bear out *Miller*'s prediction: A discretionary sentencing procedure has indeed helped make life-without-parole sentences for offenders under 18 'relatively rar[e].'" (alteration in original) (quoting *Miller*, 567 U.S. at 484 n.10)).

Two objective indicia tell the story best: (1) legislative enactments, i.e., sentencing statutes, and (2) state court decisions holding state sentencing statutes unconstitutional. Taken together, these provide strong objective evidence of the nation's contemporary standards for sentencing juvenile homicide offenders who fit Mr. Booker's circumstances.

Here, those objective indicia demonstrate that now, almost ten years after *Miller*, sentencing statutes like Tennessee's have disappeared. Now, only one state sentences juvenile offenders to a mandatory non-aggregated sentence of more than fifty years for first-degree murder with no aggravating factors—Tennessee.[5] This is compelling data that Tennessee's sentencing framework for juvenile defendants convicted of first-degree murder, with no aggravating factors, stands far apart from the rest of the nation.

Turning to actual sentencing practices, assessing the frequency with which a *mandatory* sentence is imposed reveals little about community standards because by definition there are no other available options. It is instructive to recall, however, that defendants resentenced under the Supreme Court's decisions in *Miller* and *Montgomery* were rarely given sentences of life without parole. *See Jones*, 141 S. Ct at 1322. This shows that, in actual practice, such severe sentences for juveniles convicted of homicide are disfavored.

The direction and pace of change regarding the challenged sentencing practice is also illuminating. Ten years ago, before the U.S. Supreme Court decided *Miller*, twenty-eight states had mandatory life-without-parole statutes applicable to juveniles. *See Miller*, 560 U.S. at 513–14 (Alito, J., dissenting). As *amici* have shown, many states changed their laws in the last decade, post-*Miller*.[6] The consistent direction of the changes, by either legislative enactment or state court decision, has been to either reduce the mandatory sentence applicable to juveniles or insert discretion into sentencing for juveniles.[7] Most

---

[5] The gap between Tennessee and the rest of the country is substantial. As noted by the plurality opinion, the next longest mandatory sentences, in Oklahoma and Texas, are over ten years shorter than the term set forth in Tennessee Code Annotated § 40-35-501(h)(2). In twelve other states, the maximum mandatory sentence with no discretionary review is between one third to one half less than Tennessee's mandated sentence. In twenty-three other states and the District of Columbia, a juvenile convicted of first-degree murder serves less than half the time as in Tennessee before becoming eligible for some type of individualized consideration. Twelve other states *may* impose a sentence as long as Tennessee's, but their sentencing authorities have discretion to impose a lesser sentence. *See* Plurality Op. nn.12–16.

[6] Asked at oral argument about the startling level of change in state laws through either legislative enactment or court decision, the State observed that many of the changes were prompted by the *Miller* decision. The dissent echoes this observation. The State conceded, however, that the great majority of changes in other states went considerably further than was needed to come into strict compliance with *Miller*'s holding.

[7] The change in national consensus on sentencing juvenile homicide offenders recalls the change that occurred over twenty years ago regarding the execution of intellectually impaired offenders, as recognized by the U.S. Supreme Court in *Atkins*, which held that imposing the death penalty on persons

-7-

states went well beyond *Miller*'s explicit requirements. In a relatively short number of years, societal standards on juvenile homicide offenders have consistently moved away from mandatory sentences of over fifty years.

These objective indicia are compelling. Considered as a whole, they do more than demonstrate that Tennessee's sentencing practice is unusual. These objective indicia suggest that every other state in the nation has decided that a *mandatory* sentence of more than fifty years for juveniles convicted of first-degree murder, with no aggravating factors, creates an unacceptable risk of a disproportionate sentence. In other words, there is now a national consensus *against* the type of statute Tennessee has.

### 3. *Proportionality*

In our analysis, the seriousness of Mr. Booker's crime must weigh heavily. The Eighth Amendment's proportionality principle does not just implicate the status of the offender and the severity of the punishment; it also addresses the nature of the crime. *See Graham*, 560 U.S. at 86 (Roberts, C.J., concurring in the judgment). Moreover, there are clearly some juvenile offenders from whom society needs and deserves protection for fifty-one years—or even longer.

But there are other juvenile offenders convicted of first-degree murder for whom such a lengthy incarceration is not warranted. A mandatory sentence, coupled with a minimum service in excess of fifty years, presents a serious risk of a disproportionate sentence. Is the risk of a disproportionate sentence so high for juvenile offenders that Tennessee's statutes violate the Eighth Amendment? The objective indicia in this case provide a solid foundation for making that assessment. Considering the qualities of youth the U.S. Supreme Court has recognized, as well as the compelling objective indicia of a national consensus, I agree with the plurality's conclusion that an automatic life sentence with a minimum of fifty-one years, when imposed on juveniles convicted of first-degree murder with no aggravating factors, violates the Eighth Amendment.

The evidence of national consensus in this case provides both the basis of the Eighth Amendment proportionality analysis and its limiting principle. I would not join the plurality's judgment in favor of Mr. Booker in the absence of solid objective indicia of national consensus.

---

with intellectual disabilities violated the United States Constitution. 536 U.S. at 314 (commenting that "[m]uch has changed since" the Court issued its decision in *Penry v. Lynaugh*, 492 U.S. 302, 340 (1989), holding that executing intellectually disabled people convicted of capital offenses did not contravene the Eighth Amendment). *See Coleman v. State*, 341 S.W.3d 221, 234–35 (Tenn. 2011) (summarizing the changes regarding intellectual disability).

## II.    REMEDY

Because the unconstitutionally high risk of a disproportionate sentence for juvenile homicide offenders stems from Tennessee's unique combination of (1) a mandatory sentence plus (2) a minimum incarceration period of over fifty years, that risk can be ameliorated by changing either parameter.  In other words, the unacceptably high risk of disproportionality can be reduced by either (a) giving sentencing authorities discretion to sentence juveniles convicted of first-degree murder a lesser sentence, or (b) reducing the mandatory sentence applicable to juveniles convicted of first-degree murder to a level that comports with the national standards, as reflected in other states' sentencing statutes.

The remedy adopted in Justice Lee's plurality opinion accomplishes this, and is consistent with the positions of the parties in the event of a finding of unconstitutionality.  As described in Justice Lee's plurality opinion, the remedy applies the pre-1995 version of Tennessee Code Annotated § 40-35-501(h) to Mr. Booker, a juvenile offender convicted of first-degree murder with no aggravating factors.[8]  Thus, Mr. Booker will remain sentenced to a sixty-year term, but he is eligible for—though not guaranteed—supervised release on parole after serving between twenty-five and thirty-six years. For this reason, I concur in the remedy adopted in Justice Lee's plurality opinion.

This remedy leaves the General Assembly free, in its discretion, to enact a new sentencing statute for juvenile offenders convicted of first-degree murder with no aggravating factors, consistent with the national consensus.

## III.    REJOINDER

Justice Bivins's well-stated dissent makes a number of important points that warrant this respectful response.

The dissent first says the majority "impermissibly moves the Court into an area reserved to the legislative branch."  It does not.

The view expressed in the dissent was rejected by the Founders in the earliest days of our nation.   The Federalist Papers explain that, when courts hold statutes unconstitutional, it does not mean the judiciary has assumed superiority over the legislative branch.  It means instead that the Constitution is superior to both branches:

---

[8] This appears consistent with the remedy suggested by the State in the event of a finding of unconstitutionality, to elide the objectionable part of Tennessee Code Annotated § 40-35-501 that requires service of at least fifty-one years in prison, as to juvenile offenders convicted of first-degree murder, and hold that the remainder of the statute is enforceable.

> If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the Constitution. . . . [T]he courts were designed to be an intermediate body between the people and the Legislature, in order, among other things, to keep the latter within the limits assigned to their authority. . . .
>
> Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the Legislature, declared in its statutes, stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the latter rather than the former.

*The Federalist No.* 78 (Alexander Hamilton).  In ruling on the constitutionality of a statute, we do not usurp the job of the legislative branch; we do our own job.

The dissent next notes that the holding in *Miller* dealt only with sentences of life without parole, and admonishes that the majority fails to apply the Supreme Court's holdings "as they are written, not what we wish were true."[9]

And yet the dissent acknowledges that the Supreme Court has never addressed whether a statute such as Tennessee's violates the Eighth Amendment.  Respectfully, judicial restraint does not prohibit lower courts from taking up constitutional issues of first impression.  It's been an everyday practice since the earliest days of our nation.[10]

---

[9] The dissent cites cases such as *Arkansas v. Sullivan*, 532 U.S. 769 (2001). *Sullivan* says only that states are not free to contradict the Court's "controlling precedent" on factual situations where the Court has issued a definitive ruling.  *Id*. at 771.  Nothing in that opinion, or any other, prohibits states from considering issues of first impression under the federal constitution.

[10] Years before he penned his famous dissent in *Plessy v. Ferguson*, Justice John Marshall Harlan wrote for the United States Supreme Court:

> Upon the state courts, equally with the courts of the Union, rests the obligation to guard, enforce, and protect every right granted or secured by the constitution of the United States and the laws made in pursuance thereof, whenever those rights are involved in any suit or proceeding before them; for the judges of the state courts are required to take an oath to support that constitution, and they are bound by it. . . .  If they fail therein . . . the party aggrieved may bring the case from the highest court of the state in which the question could be decided, to this court for final and conclusive determination.

The question of whether Tennessee's mandatory life sentence statute, as applied to juveniles, violates the Eighth Amendment has not yet been presented to the United States Supreme Court.  It has been presented to us.  We are obliged to answer it as best we can.  Our decision is then subject to the High Court's review.

Next, in its analysis, the dissent offers a lengthy discourse on why Tennessee's mandatory life sentence, as applied to juvenile offenders, is not the "functional equivalent" of a life-without-parole sentence.  The inclusion of this discussion is a puzzler.

Here's why.  In this appeal, Mr. Booker offered two theories for why Tennessee's statute violates the Eighth Amendment.  First, Mr. Booker argued that, under the well-established Eighth Amendment analysis in *Roper*, *Graham*, etc., and based on objective indicia of a national consensus, Tennessee's mandatory sentencing statute violates the Eighth Amendment.  Second, in the alternative, Mr. Booker contended that Tennessee's mandatory life sentence is the "functional equivalent" of a mandatory sentence of life without parole, which was held unconstitutional in *Miller*.

In both the plurality opinion and this separate opinion, the majority of the Court relies exclusively on the well-established Supreme Court analytical framework to hold that Tennessee's statute violates the Eighth Amendment.  That pretermits Mr. Booker's alternative "functional equivalency" argument.  There was no reason to even discuss it.

If the majority doesn't even discuss the alternative functional equivalency argument, there's no reason for the dissent to spend pages and pages discrediting it.[11]  Meanwhile, however, the dissent fails to refute the reasoning *actually* relied upon by the majority of the Court.

Perhaps most troubling, the dissent virtually ignores the objective indicia of a national consensus against a sentencing statute like Tennessee's.  The dissent's only response to it is to shrug—in a footnote—that there is no way to "predict with confidence what the Supreme Court may say" if it were faced with the data Mr. Booker presents.

This is weak tea.  The conclusion demonstrated by the objective indicia in this case is irrefutable: Tennessee's mandatory life sentence, as applied to juveniles, renders our State an island in the nation.  We must not simply shrug that off.

---

*Robb v. Connolly*, 111 U.S. 624, 637 (1884).

[11] The only reason offered by the dissent is that the functional equivalency argument is used in *other* state and federal court opinions.  Perhaps they are dissenting from those other opinions.  It makes little sense for the dissent to fault the majority for failing to use the functional equivalency reasoning for its holding, and then turn around and criticize that very same reasoning.

## IV. CONCLUSION

For these reasons, I concur in the plurality's holding that Tennessee Code Annotated section 40-35-501(h)(2), when imposed on a juvenile homicide offender, violates the prohibition against cruel and unusual punishment in the Eighth Amendment to the United States Constitution. I concur in the remedy adopted by the plurality, to hold that Mr. Booker remains sentenced to sixty years in prison but shall be allowed an individualized parole hearing after he has served between twenty-five and thirty-six years in prison, based on release eligibility in the previous version of Tennessee Code Annotated section 40-35-501(h)(2) in effect from November 1, 1989, to July 1, 1995, as stated in section 40-35-501(h)(1). I concur in the plurality's holding that this ruling applies only to offenders who were juveniles at the time of the offense.

_____
HOLLY KIRBY, JUSTICE

-12-